UNITED STATES, Use of DELAWARE HARDWARE CO., v. LYNCH et al.

(District Court, D. Delaware. February 1, 1912.)

No. 4.

*(Syllabus by the Court.)*

1. UNITED STATES (§ 67*)—CONTRACTOR'S BOND—DISCHARGE OF SURETY—EXTENSION OF TIME OF PAYMENT.

A corporate surety in a contractor's bond given pursuant to the act of Congress of August 13, 1894 (28 Stat. 278, c. 280 [U. S. Comp. St. 1901, p. 2523]), as amended by act of February 24, 1905 (33 Stat. 811, c. 778 [U. S. Comp. St. Supp. 1909, p. 948]), is not discharged from liability to a sub-contractor for default of payment by the contractor for materials supplied by the sub-contractor and used in the prosecution of the work provided for in the contract, by reason of a binding extension by the sub-contractor without the knowledge of the surety, of the time of payment notwithstanding resulting loss to the surety, where the extension is bona fide and not in excess of a reasonable, usual or customary credit.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. § 67.*]

2. UNITED STATES (§ 67*)—CONTRACTOR'S BOND—DISCHARGE OF SURETY—EXTENSION OF TIME OF PAYMENT.

Loss to the surety by reason of the binding extension cannot be found where both the sub-contractor and the surety have been during the whole period of the extension without knowledge or notice of the circumstances injuriously affecting the interests of the surety, and the latter has remained in ignorance of the fact of the extension, and has not for its own protection made any application to the United States or the contractor or in any other quarter, or in any manner been led to change its position or omit action.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. § 67.*]

3. PRINCIPAL AND SURETY (§ 156*)—REMEDIES OF CREDITORS—PLEADING.

Loss to the surety is not sufficiently set forth in the pleadings where recourse is had solely to hypothetical inferences, contingencies or possibilities of damage.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 423–426; Dec. Dig. § 156.*]

At Law. Action by the United States of America, for the use of the Delaware Hardware Company, against Joseph G. Lynch and others. Demurrer to plea sustained.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

William S. Hilles, for plaintiff.

Ward, Gray & Neary and Benjamin A. Stansbury, for defendant Fidelity & Deposit Co. of Maryland.

BRADFORD, District Judge. This is an action of debt brought in the name of the United States of America for the use of the Delaware Hardware Company against Joseph G. Lynch, Jacob A. Lynch and Calvin Z. Lynch trading as Lynch Bros., and the Fidelity and Deposit Company of Maryland, on a bond given by the defendants under and pursuant to the act of Congress of August 13, 1894, entitled "An act for the protection of persons furnishing materials and labor for the construction of public works," 28 Stat. 278 (U. S. Comp. St. 1901, p. 2523), as amended by the act of February 24, 1905, 33 Stat. 811 (U. S. Comp. St. Supp. 1909, p. 948). The act as amended, among other things, provides:

"That hereafter any person or persons entering into a formal contract with the United States for the construction of any public building, or the prosecution and completion of any public work, or for repairs upon any public building or public work, shall be required, before commencing such work, to execute the usual penal bond, with good and sufficient sureties, with the additional obligation that such contractor or contractors shall promptly make payments to all persons supplying him or them with labor and materials in the prosecution of the work provided for in such contract; and any person, company, or corporation who has furnished labor or materials used in the construction or repair of any public building or public work, and payment for which has not been made, shall have the right to intervene and be made a party to any action instituted by the United States on the bond of the contractor, and to have their rights and claims adjudicated in such action and judgment rendered thereon, subject, however, to the priority of the claim and judgment of the United States. If the full amount of the liability of the surety on said bond is insufficient to pay the full amount of said claims and demands, then, after paying the full amount due the United States, the remainder shall be distributed pro rata among said intervenors. If no suit should be brought by the United States within six months from the completion and final settlement of said contract, then the person or persons supplying the contractor with labor and materials shall, upon application therefor, and furnishing affidavit to the Department under the direction of which said work has been prosecuted that labor or materials for the prosecution of such work has been supplied by him or them, and payment for which has not been made, be furnished with a certified copy of said contract and bond, upon which he or they shall have a right of action, and shall be, and are hereby, authorized to bring suit in the name of the United States in the circuit court of the United States in the district in which said contract was to be performed and executed, irrespective of the amount in controversy in such suit, and not elsewhere, for his or their use and benefit, against said contractor and his securities, and to prosecute the same to final judgment and execution: Provided, That where suit is instituted by any of such creditors on the bond of the contractor, it shall not be commenced until after the complete performance of said contract and final settlement thereof, and shall be commenced within one year after the performance and final settlement of said contract and not later: And provided further, That where suit is so instituted by a creditor or by creditors, only one action shall be brought, and any creditor may file his claim in such action and be made party thereto within one year from the completion of the work under said contract, and not later. If the recovery on the bond should be inadequate to pay the amounts found due to all of said creditors, judgment shall be given to each creditor pro rata of the amount of the recovery. The surety on said bond may pay into court, for distribution among said claimants and creditors, the full amount of the sureties' liability, to wit, the penalty

named in the bond, less any amount which said surety may have had to pay to the United States by reason of the execution of said bond, and upon so doing the surety will be relieved from further liability."

The bond in suit bears date November 16, 1908, and was executed by Lynch Bros. as principals and the Fidelity and Deposit Company of Maryland as surety. It recites that Lynch Bros. had entered into a contract with the United States for furnishing labor and materials required in the construction of certain military buildings, consisting of a two-company barrack building, and a band barrack building, and contains a condition that it should be void if Lynch Bros. or their heirs or personal representatives should fully perform all covenants, conditions and agreements in the building contract on their part to be performed and should promptly make full payments to all persons supplying labor or materials in the prosecution of the work contracted for. Service of process was not effected on Lynch Bros. nor has there been an appearance for them or any of them in the suit. The declaration was accordingly filed against the surety. It contains two counts in each of which the sum of $32,500, the penalty of the bond, is declared for. The declaration does not in either of the counts assign any breach of the condition of the bond, but makes profert and has annexed to it a copy of the bond and its condition. The Fidelity and Deposit Company of Maryland, without craving oyer of the bond and its condition, has interposed a plea to both counts which after averring that the condition of the bond was that if the principal therein should "promptly make full payments to all persons supplying labor or material in the prosecution of the work provided for in said contract, then the above obligation shall be void and of no effect, otherwise to remain in full force and virtue," is to the effect that the hardware company furnished materials in the prosecution of the work provided for in the contract under an agreement with Lynch Bros. that payment should be made by them for materials furnished when and as they received from the United States payment on account of the work contracted for; that Lynch Bros. August 25, 1909, without the knowledge or consent of the surety gave to the hardware company their negotiable promissory note dated on that day for $500, payable to its order, and maturing November 25, 1909, to be applied on account of indebtedness then existing for materials so furnished by it; that the two-company barrack building provided for in the contract mentioned in the bond was completed by Lynch Bros. and accepted by the United States, and final payment therefor was made by the latter to the former September 22, 1909; that the band barrack building provided for in that contract was completed by Lynch Bros. and accepted by the United States, and final payment therefor was made by the latter to the former October 7, 1909; that the hardware company accepted the above mentioned note of Lynch Bros. and, in consideration of the payment by them of a certain sum in advance as interest on the note or an agreement on their part to pay such sum in advance as such interest, agreed to extend the time for the payment by Lynch Bros. of their indebtedness to the hardware company for materials theretofore furnished until November 25, 1909,

the date of the maturity of the note, "without notice to, the knowledge of or consent by" the surety; that by such extension of credit the hardware company was prevented from enforcing its claim against Lynch Bros. for such indebtedness when final payment was made to them by the United States for the work provided for in the contract, and when the claim of the hardware company was due and payable under its agreement with Lynch Bros.; that Lynch Bros. November 24, 1909, and before the expiration of the above mentioned extension of credit filed their petition in bankruptcy and were thereafter duly adjudged bankrupts; that during the period covered by such extension and before the surety became aware of the fact that an extension had been granted certain moneys due from the United States to Lynch Bros. under the contract were paid to them on or about September 22, 1909, and October 5, 1909, the dates of the completion of the two-company barrack building and the band barrack building respectively, which sums of money had been retained by the United States "for the purpose of making good any defects in said contracts, and for the purpose of discharging the claims of any person, firm or corporation furnishing labor and materials in the prosecution of the work provided for in the said contract, and which sums were properly applicable to the payment of accounts of such person, firm or corporation furnishing labor and materials on said contracts at the instance of" the surety; that the sums of money paid as above stated, which would have been available to pay the indebtedness of the hardware company, were paid to and disposed of by Lynch Bros. during the period of the extension of credit, resulting in great damage and injury to the surety; that by reason of the extension of credit without notice to or consent of the surety, knowledge that Lynch Bros. were not making payments to persons supplying labor and materials in the prosecution of the work under the contract with the United States was withheld from the surety until after Lynch Bros. had used the moneys received from the United States in final payment and had become insolvent and bankrupt, and until after the lapse of the period in which the surety, had it had notice of the extension of credit and of the failure of Lynch Bros. to make prompt payments as stipulated, could and would have caused the withholding by the United States of the amount of the final payments to Lynch Bros. and the payment therefrom of the claims of the hardware company and other persons furnishing labor and materials, whereby the surety "was deprived of the protection available to it and was thereby greatly injured and damaged and was and is wholly released and discharged from the condition of the bond declared upon in this action and from all obligations thereunder." To this plea the plaintiff has demurred, assigning, among others, the following grounds:

"2. It does not appear that any unusual credit or extension of time was given by the said Delaware Hardware Company to the said Lynch Bros. in the taking of the said note.

"3. It does not appear that the said defendant was in any way damaged or injured by the taking of the said note by the said Delaware Hardware Company."

[1] The doctrine that the liability of a surety is strictissimi juris. recognizes his right to stand upon the terms of his contract, and forbids the extension by construction or implication of his liability beyond the fair scope of those terms. Miller v. Stewart, 9 Wheat. 680,. 6 L. Ed. 189; Leggett v. Humphreys, 21 How. 66, 16 L. Ed. 50;. Reese v. United· States, 9 Wall. 13, 21, 19 L. Ed. 541. If the contract for the performance of which he is surety be changed without. his knowledge or consent he is discharged from liability for all defaults thereafter occurring; for such change results in a new contract with respect to which he never undertook to be surety, and consequently it is wholly immaterial whether such change would or would. not tend to benefit him. Thus a binding agreement between a creditor and debtor extending for a definite period the time for payment without the consent of the surety releases the latter. In Guaranty Co. v. Pressed Brick Co., 191 U. S. 416, 24 Sup. Ct. 142, 48 L. Ed. 242, the court said:

"It is conceded that, by the general law of suretyship, any change whatever in the contract for the performance of which the guarantor is liable, made without his consent, such, for instance, as an extension of time for payment, if made upon sufficient consideration, discharges the guarantor from liability."

The rule that the liability of a surety is strictissimi juris has, however, been much relaxed in cases of corporate suretyship generally, and especially of such suretyship entered into under and pursuant to the act of August 13, 1894, as amended February 24, 1905. Hill v. American Surety Co., 200 U. S. 197, 26 Sup. Ct. 168, 50 L. Ed. 437;. Guaranty Co. v. Pressed Brick Co., 191 U. S. 416, 24 Sup. Ct. 142,. 48 L. Ed. 242; Young v. American Bonding Co., 228 Pa. 373, 77 Atl. 623; Title Guaranty & Trust Co. v. Crane Co., 219 U. S. 24, 31 Sup. Ct. 140, 55 L. Ed. 72; Phila. v. Fidelity & Deposit Co., 231 Pa. 208, 80 Atl. 62; United States v. Ætna Indem. Co., 40 Wash. 87, 82 Pac. 171; Mankin v. Ludowici-Celadon Co., 215 U. S. 533, 30· Sup. Ct. 174, 54 L. Ed. 315; Lesley v. Kite, 192 Pa. 268, 43 Atl. 959; United States v. National Surety Co., 92 Fed. 549, 34 C. C. A. 526. In Hill v. American Surety· Co., 200 U. S. 197, 26 Sup. Ct. 168, 50· L. Ed. 437, the court having under consideration the act of August 13, 1894, said:

"The courts of this country have generally given to statutes intending to secure to those furnishing labor and supplies for the construction of buildings a liberal interpretation, with a view of effecting their purpose to require payment to those who have contributed by their labor or material to the erection of buildings to be owned and enjoyed by those who profit by the contribution of such labor or materials. Mining Co. v. Cullins, 104 U. S. 176, 177 [26 L. Ed. 704]. And the rule which permits a surety to stand upon his strict legal rights, when applicable, does not prevent a construction of the bond with a view to determining the fair scope and meaning of the contract in the light of the language used and the circumstances surrounding the parties. Ulster County Savings In. v. Young, 161 N. Y. 23, 30 [55 N. E. 483]. As against the United States, no lien can be provided upon its public buildings or grounds, and it was the purpose of this act to substitute the obligation of a bond for the security which might otherwise be obtained by attaching a lien to the property of an individual. The purpose of the law is, as its title declares: 'For the protection of persons furnishing materials and labor for the construction of public works.' If literally construed,.

the obligation of the bond might be limited to secure only persons supplying labor or materials directly to the contractor, for which he would be personally liable. But we must not overlook, in construing this obligation, the manifest purpose of the statute to require that material and labor actually contributed to the construction of the public building shall be paid for and to provide a security to that end."

In Young v. American Bonding Co., 228 Pa. 373, 77 Atl. 623, the court say:

"The trend of all our modern decisions, federal and state, is to distinguish between individual and corporate suretyship where the latter is an undertaking for money consideration by a company chartered for the purpose of such business. In the one case the rule of strictissimi juris prevails, as it always has; with respect to the other, because it is essentially an insurance against risk, underwritten for a money consideration by a corporation adopting such business for its own profit, the courts generally hold that such a company can be relieved from its obligation of suretyship only where a departure from the contract is shown to be a material variance."

In United States v. National Surety Co., 92 Fed. 549, 34 C. C. A. 526, it was held by the circuit court of appeals for the eighth circuit that the surety in a contractor's bond given pursuant to the act of August 13, 1894, was not discharged from liability to persons supplying labor and materials by changes in the contract or specifications, agreed upon by the United States and the contractor subsequent to the execution of the bond without the knowledge or consent of the surety, where the general nature of the work and materials remains the same. The court said:

"The real plaintiff is the corporation for whose use the suit was brought, and it sues to enforce an obligation which congress required to be inserted in the bond for its protection and for the protection of others who might furnish labor or materials while the work was in progress. * * * The bond which is provided for by the act was intended to perform a double function.—in the first place, to secure to the government, as before, the faithful performance of all obligations which a contractor might assume towards it; and, in the second place, to protect third persons from whom the contractor obtained materials or labor. Viewed in its latter aspect, the bond, by virtue of the operation of the statute, contains an agreement between the obligors therein and such third parties that they shall be paid for whatever labor or materials they may supply to enable the principal in the bond to execute his contract with the United States. The two agreements which the bond contains, the one for the benefit of the government, and the one for the benefit of third persons, are as distinct as if they were contained in separate instruments, the government's name being used as obligee in the latter agreement merely as a matter of convenience. In view of these considerations, we are of opinion that the sureties in a bond, executed under the act now in question, cannot claim exemption from liability to persons who have supplied labor or material to their principal to enable him to execute his contract with the United States, simply because the government and the contractor, without the surety's knowledge, have made some changes in the contract, subsequent to the execution of the bond given to secure its performance, which do not alter the general character of the work contemplated by the contract or the general character of the materials which are necessary for its execution."

The foregoing language is equally applicable to the case of a bond given under the above act as amended February 24, 1905.

The decision of the demurrer under consideration is, I think, controlled by Guaranty Co. v. Pressed Brick Co., 191 U. S. 416, 24 Sup.

192 F.—24

Ct. 142, 48 L. Ed. 242, notwithstanding some dissimilarity in the facts. That case, too, related to a contractor's bond given under the act of August 13, 1894, while here the bond was executed pursuant to that act as amended by the act of February 24, 1905. But the condition of a contractor's bond is the same so far as material to this case, whether given under the later or under the earlier act. As stated in Mankin v. Ludowici-Celadon Co., 215 U. S. 533, 538, 30 Sup. Ct. 174, 176, 54 L. Ed. 315:

"In respect to the condition of the bond required to be given, the language of the amended act is precisely the same as that contained in the act of August 13, 1894, and the condition is that 'such contractor or contractors shall promptly make payments to all persons supplying him or them with labor and materials in the prosecution of the work provided for in such contract.'"

In Guaranty Co. v. Pressed Brick Co. a bond had been executed by one McIntyre as principal and the United States Fidelity and Guaranty Company as surety in connection with a contract to furnish labor and materials and do certain work in the erection of a mint in Denver. The action was brought by the United States for the use of the brick company, which had furnished brick to the principal contractor. The surety denied its liability on the ground that the brick company had without the consent or knowledge of the former granted to McIntyre October 1, 1898, an extension of the time of payment of the balance due for brick so furnished, and accepted two promissory notes therefor, one at thirty days and the other at sixty days after September 15, 1898. It was held that the surety had not been discharged by such extension of time. The court said:

"The question involved is whether the ordinary rule that exonerates the guarantor, in case the time fixed for the performance of the contract by the principal be extended, applies to a bond of this kind executed by a Guaranty Company, not only for a faithful performance of the original contract, but for the payment of the debts of the principal obligor to third parties, * * * In an ordinary guaranty the guarantor understands perfectly the nature and extent of his obligation. If he becomes surety for the performance of a building contract, he is presumed to know the parties, the terms of their undertaking. the extent and feasibility of the work to be done, the character and responsibility of the principal obligor, and his ability to carry out the contract. If he guarantees the payment of a particular debt, he usually knows the exact amount of the debt, the time when it matures, and something of the ability of the principal to meet it. If he becomes responsible for the payment of the principal's debts generally, or lends his credit to a proposed purchaser of goods, he knows the amount of his liability and the means of his principal to meet. them. In such cases he contracts in reliance upon the exact terms of his principal's undertaking, and has a right to suppose that no change will be made without his consent; and the courts have gone so far as to hold that any change will exonerate him, though it really redound to his benefit. This covenant, however, is inserted for an entirely different purpose from that of securing to the government the performance of the contract for the construction of the building. Inasmuch as neither the contractor nor his sub-contractors can secure themselves by a mechanic's lien upon the proposed building, the government, solely for the protection of the latter, requires a covenant for the prompt payment of their claims, and the same security that it requires for the performance of the principal contract. In this covenant the surety guarantees nothing to the principal obligee—the government—though the latter permits an action upon the bond for the benefit of the sub-contractors. The covenant is made solely

for their benefit. The guarantor is ignorant of the parties with whom his principal may contract, the amount, the nature, and the value of the materials required, as well as the time when payment for them will become due. These particulars it would probably be impossible even for the principal to furnish, and it is to be assumed that the surety contracts with knowledge of this fact. Not knowing when or by whom these materials will be supplied, or when the bills for them will mature, it can make no difference to him whether they were originally purchased on a credit of sixty days, or whether, after the materials are furnished, the time for payment is extended sixty days, and a note given for the amount maturing at that time. If a person deliberately contracts for an uncertain liability he ought not to complain when that uncertainty becomes certain. Stress is laid upon the fact that the defendant company guaranteed that the principal obligor should 'promptly' make payment to his material men, and that this, properly interpreted, required that the contractor should pay at once upon the maturity of the bills, and that as such bills became due October 1, 1898, the promptness guaranteed required their immediate payment. We are not impressed with the force of this contention. If the word 'promptly' has any particular significance in this connection, it is satisfied by such payment as the sub-contractor shall accept as having been promptly made; or perhaps it was intended to give him an immediate action upon the bond, in case such payment be not made with sufficient promptness. It was not intended, however, that the want of an immediate payment should be set up as a defence by the surety. As these bills are rarely paid the very day they become due, the narrow construction claimed would destroy the principal value of the security. The facts of this case do not call for an expression of opinion as to whether, if an unusual credit were given, and in the meantime the principal obligor had become insolvent, or the surety were otherwise damnified by the delay, it might not be exonerated; since neither of these contingencies supervened in this case, we are remitted to the naked proposition whether the giving of a customary credit, with no evidence of loss thereby occasioned, is sufficient to discharge the surety. We find no difficulty whatever in answering this question in the negative. The rule of strictissimi juris is a stringent one, and is liable at times to work a practical injustice. It is one which ought not to be extended to contracts not within the reason of the rule, particularly when the bond is underwritten by a corporation, which has undertaken for a profit to insure the obligee against a failure of performance on the part of the principal obligor. Such a contract should be interpreted liberally in favor of the sub-contractor with a view of furthering the beneficient object of the statute. Of course, this rule would not extend to cases of fraud or unfair dealing on the part of a sub-contractor, as was the case in United States v. American Bonding & Trust Co. [C. C.] 89 Fed. 921, 925, or to cases not otherwise within the scope of the undertaking."

There was no allegation in the above case that by reason of the extension of the time of payment the surety had sustained any loss or injury, and it is urged on the part of the surety here that it is fairly to be deduced from the language of the court that, had it appeared that the surety had suffered loss or damage from the extension, although granted for only a reasonable time, the surety would have been discharged. But this is a misapprehension caused mainly, if not wholly, by a palpable variance between the last two lines of the syllabus of the case and the language of the court. The syllabus states that the surety, under the circumstances therein set forth, will not necessarily be relieved "where it does not appear that such extension was unreasonable, or that the surety was prejudiced thereby"; from which it naturally might be inferred that the surety would be discharged, not only by an unreasonable extension, but equally by loss sustained through an extension, whether reasonable or unreasonable. But the

court said nothing of the kind either in form or substance nor anything from which such a deduction reasonably could be made. The court refrained from expressing an opinion on the question "whether, if an unusual credit were given, and in the meantime the principal obligor had become insolvent, or the surety were otherwise damnified by the delay, it might not be exonerated," and said:

"Since neither of these contingencies supervened in this case, we are remitted to the naked proposition whether the giving of a customary credit, with no evidence of loss thereby occasioned, is sufficient to discharge the surety."

The two contingencies above referred to were the giving of an unusual credit to the principal obligor, and loss or damage to the surety whether caused by the occurrence of insolvency of the former in the meantime or by the unusual credit in any other manner. The case disclosing only a "customary credit" and no "loss thereby occasioned" or, in other words, no unusual credit, and no loss to the surety occasioned by it, the court, of course, treated the question as reduced to a "naked proposition." But the court did not say or intimate that damage or loss resulting, in the absence of fraud, to the surety from only a customary or usual credit would discharge him. To resort to such a construction as would have this effect would conflict with the plain meaning of the clause last above quoted and is forbidden by the broad language and spirit of the opinion. To hold that the words "otherwise damnified by the delay" in the clause do not have reference to the "unusual credit" mentioned only a couple of lines before would violate the rules of correct diction and introduce wholly unnecessary uncertainty and confusion. The only extension mentioned is "an unusual credit" and the words "and in the meantime" have reference to that credit, and equally apply to insolvency of the principal obligor or damage otherwise resulting to the surety from the delay. In the present case it is not alleged in the plea that the hardware company practiced or meditated any fraud or wrong against the surety or had knowledge or notice of the financial standing of Lynch Bros. at the time of granting the extension. Nor is it alleged, nor can this court say as matter of law, that the extension in and by itself was unreasonable, or other than a proper and customary credit. The question, then, at this point is whether in the absence of fraud or unfair dealing the binding extension for a reasonable, usual and proper period by the hardware company to Lynch Bros. of the time for the payment of their debt to it, has discharged the surety because of loss or damage sustained by it by reason of such extension. In solving this question it is helpful to advert for a moment to the general principles of suretyship. Under those principles the creditor does not owe to the surety any duty of active diligence as against the principal, and he does not lose his remedy against the surety by omitting to proceed against the principal, although the latter afterwards becomes insolvent. Indeed, there is great conflict in the decisions on the question whether it is necessary that the creditor even at the request of the surety should pursue the principal in order to retain his rights as against the surety. However this may be, it is clearly settled that

in the absence of fraud or wrongful intent on the part of the creditor he may, after default by the principal, notwithstanding lapse of time short of any binding limitation, recover against the surety, although in the meantime and after the debt falls due the principal becomes insolvent and bankrupt. Wilds v. Attix, 4 Del. Ch. 253; Hunt v. Bridgham, 2 Pick. (Mass.) 581, 13 Am. Dec. 458. If, however, there be a binding extension of the time for payment without the consent of the surety he is discharged, as before stated, because he never undertook to incur the liability of a surety with respect to the contract, changed through such extension. Guaranty Co. v. Pressed Brick Co. has established the inapplicability of this rule to bonds such as that here in suit, where the extension is reasonable and there is no fraud or wrong on the part of the creditor connected with the extension. If the suretyship be not terminated through such a bona fide and reasonable binding extension I fail to perceive any ground on which the surety can be relieved from liability for non-performance by the contractor of precisely those things for the performance of which the surety became bound as such. The contention was made at the hearing on the part of the surety that whether a binding extension, reasonable and usual in and by itself, can be held reasonable and proper must be determined by matter ex post facto. In other words, if loss or damage to the surety has resulted from it, it must be held unreasonable, so far as enforcing the liability of the surety is concerned, but if unattended with loss or damage to him it can properly be held reasonable. This contention seems to reduce the liability of a surety not discharged by a binding extension to a shadow and an absurdity. If such an extension does not terminate the suretyship from the time it is granted the surety must remain liable as surety in the same manner and to the same extent as if the extension had not been given. Guaranty Co. v. Pressed Brick Co. in deciding that the surety in a building contractor's statutory bond is not discharged through the granting in good faith of a binding and reasonable extension of the time of payment, abrogates in such case the application of the rule that any binding extension given without the consent of the surety discharges him, and therefore leaves the surety in the same position he would have occupied in the absence of an extension and subject only to the general principles of suretyship above adverted to. Whatever increased risk the surety incurs by reason of loss or damage sustained by him through and during the period of a reasonable and bona fide extension is a liability which he voluntarily assumes in becoming a party to such a bond as that in suit. This is, I think, a reasonable and necessary deduction from the language of the court in Guaranty Co. v. Pressed Brick Co., for in reference to the covenant or condition to "promptly make payments" to all persons supplying labor and materials in the prosecution of the work contracted for it was said:

"In this covenant the surety guarantees nothing to the principal obligee—the government—though the law permits an action upon the bond for the benefit of the sub-contractors. The covenant is made solely for their benefit. The guarantor is ignorant of the parties with whom his principal may contract, the amount, the nature, and the value of the materials required, as

well as the time when payment for them will become due. These particulars it would probably be impossible even for the principal to furnish, and it is to be assumed that the surety contracts with knowledge of this fact. Not knowing when or by whom these materials will be supplied, or when the bills for them will mature, it can make no difference to him whether they were originally purchased on a credit of sixty days, or whether, after the materials are furnished, the time for payment is extended sixty days, and a note given for the amount maturing at that time. If a person deliberately contracts for an uncertain liability he ought not to complain when that uncertainty becomes certain."

The proposition that the surety is not discharged in such a case as this from liability for loss sustained through a reasonable and bona fide binding extension of the time of payment, though without his consent or knowledge, is supported not only by the language of the court in Guaranty Co. v. Pressed Brick Co., but by decisions of other courts directly in point. In United States v. United States Fidelity & Guaranty Co. (C. C.) 172 Fed. 268, Judge Holland held that a surety on a bond given pursuant to the act of August 13, 1894, was not released from liability to a sub-contractor by the taking by the latter from the contractor of a three months' note for his claim, such note not maturing until after final settlement between the United States and the contractor, and after receivers in insolvency had been appointed for the latter. He said:

"There is no averment in this case to lead to the conclusion that an unusual credit was extended, resulting in injury to the defendant. The transaction was conducted in the usual way, and only a usual credit extended. It is not alleged that there was anything unusual either in the purchase of the material or extension of credit, and the liability resulting was a liability for which the defendant contracted when it signed the bond. The fact that the contractor became insolvent before the note given by him to the use plaintiff became due is no defense, because it cannot be said as a matter of law that three months was an unusual credit to extend to the contractor by the use plaintiff for the materials furnished. It is no unusual thing for subcontractors and contractors to take one, two, three and even four months' notes for materials furnished in all lines of construction, and, so long as it is not averred the usual course was violated in the extension of credit, it is no defense that the usual credit given in this case happened to extend the time to a point six days beyond the date when the receivers were appointed for the contractor, which was December 9, 1904. The date of final settlement was not definitely fixed in the contract, and the use plaintiff could not know when it would take place. While it is true he had furnished the material for which the notes were taken on March 4, 1904, and accepted three months' notes on September 15, 1904, there was no unusual extension of time; and, as stated by the court in Guaranty Co. v. Pressed Brick Co., supra, it could make no difference to the surety that 'after the materials are furnished the time for payment is extended 60 days [in this case 90 days] and a note given for the amount maturing at that time.'"

On a writ of error this decision was affirmed by the circuit court of appeals, 178 Fed. 692, 102 C. C. A. 192, upon another point than that on which the court below had rested its decision; the appellate court, however, expressly leaving open the question decided by Judge Holland. In United States v. Ætna Indem. Co., 40 Wash. 87, 82 Pac. 171, an action had been brought in the name of the United States for the use of the Standard Furniture Co. on a bond given pursuant to the act of August 13, 1894, against R. M. Henningsen and others, including the Ætna Indemnity Company, surety on the bond. The

plaintiff recovered judgment and the surety appealed. Henningsen and his co-partners had entered into a written contract for the construction, equipment and furnishing of a light house and two keepers' residences, and in the performance of the contract purchased from the furniture company certain furniture of the total value of $693, on which they made a partial payment of $400. No further payment having been made, an action on the bond was brought against Henningsen & Co. and the surety to recover the balance of $293. Among the defences set up by the surety was the following:

"(2) For a second and further affirmative defense this defendant alleges that the goods, wares, and merchandise alleged to have been furnished to the defendant R. M. Henningsen & Co. were furnished on or about the 17th day of April, 1903, and that the time for payment therefor by the defendant R. M. Henningsen & Co. was extended without the knowledge or consent of this surety and to its detriment."

To this alleged defence a demurrer was interposed which was sustained. The supreme court of Washington held that there was no error in sustaining the demurrer, saying:

"Appellant further contends that the court erred in sustaining respondent's demurrer to its second affirmative defense. Under authority of United States Fidelity & Guaranty Co. v. United States, 191 U. S. 416, 24 Sup. Ct. 142, 48 L. Ed. 242, we think said demurrer was properly sustained."

In passing it may be observed that the above case was cited with approval by the Supreme Court of the United States in Title Guaranty & Trust Co. v. Crane Co., 219 U. S. 24, 33, 31 Sup. Ct. 140, 55 L. Ed. 72, on another point, it is true, but without a suggestion of disapproval or doubt as to the construction placed by the Washington court upon Guaranty Co. v. Pressed Brick Co., under the name of United States Fidelity & Guaranty Co. v. United States.

I am not aware of any decision to the effect that a bona fide binding extension of the time of payment for only a reasonable or customary period, though without the consent or knowledge of the surety, will discharge the latter on account of loss or damage sustained by him by reason of such extension. On behalf of the surety company reference was made at the hearing to United States v. American Bonding & Trust Co., 89 Fed. 921, 925. But of that case two things are to be said. First, it was a case of fraud or unfair dealing by the sub-contractor, the court in Guaranty Co. v. Pressed Brick Co. stating that the rule of liberal interpretation in favor of a sub-contractor "with a view of furthering the beneficent object of the statute" would not "extend to cases of fraud or unfair dealing on the part of a sub-contractor, as was the case in United States v. American Bonding & Trust Co., 89 Fed. 921, 925, or to cases not otherwise within the scope of the undertaking." Second, that the case was decided in 1898, before the Supreme Court had enunciated the rule laid down in Guaranty Co. v. Pressed Brick Co. that on such a bond as that in suit a bona fide binding extension of the time of payment for only a reasonable period, though without the consent of the surety, will not discharge him. In Phila. v. Fidelity & Deposit Co., 231 Pa. 208, 80 Atl. 62, the court, speaking of a bond with corporate surety given

by contractors to secure payment to sub-contractors and others for labor and materials supplied in and about the construction of a public building, said:

"In its nature the obligation was more of a contract of insurance than of suretyship; so long as the extensions of credit did not go beyond the two year limit for suit fixed in the bond, and in the absence of fraud or unfair dealing on the part of the subcontractors to the prejudice of the surety, or of material harm actually suffered, the surety was not released."

If it be assumed that the above language was intended to express or suggest the idea that a bona fide binding extension for only a reasonable time without the consent of the surety would discharge the latter in case of "material harm actually suffered," that language, in so far as expressing or suggesting that idea, was a dictum, unnecessary to the decision of the case, which in fact was against the surety. Further, how far the court may have been influenced by the misleading portion of the syllabus in Guaranty Co. v. Pressed Brick Co. it is impossible to say. On authority as well as on principle I have reached the conclusion that the demurrer to the plea must be sustained on the ground that the binding extension by the hardware company of the time for payment was without fraud and was not for an unreasonable or unusual period, and, therefore, that the surety continued liable as such, within the penalty of the bond, regardless of the amount of loss or damage sustained by reason of such extension.

[2] But this case may present itself in an alternative aspect. It having been authoritatively determined that a bona fide and reasonable binding extension, although without the consent or knowledge of the surety will not ipso facto discharge the latter as such, if such extension could have any effect upon the liability of the surety the extent to which the latter would be relieved or discharged necessarily could not exceed the amount of the loss or damage caused by such extension. On the above assumption can the plea be sustained? The act of August 13, 1894, as amended by the act of February 24, 1905, provides, in substance, among other things, as has been shown, that persons who have furnished labor or materials used in the prosecution of the work contracted for, payment for which has not been made, may intervene and be made parties to any action brought by the United States on the bond of the contractor, and have their rights and claims adjudicated and judgment rendered therein, subject to the priority of the claim of the United States; that if the full amount of the penalty of the bond is insufficient to pay such claims and demands in full, after paying the full amount due the United States, the remainder shall be distributed pro rata among the intervenors; that if no suit shall be brought by the United States within six months from the "completion and final settlement of said contract" persons supplying the contractor with labor and materials shall, upon complying with certain prerequisites specified in the act, have a right of action and may bring suit in the name of the United States for their use and benefit against the contractor and his surety and prosecute the same to final judgment and execution; that where suit is so instituted only one action shall be brought and any creditor may file his claim therein

and become a party thereto within one year from the completion of the work under the contract; that if the recovery on the bond should be inadequate to pay the amounts found due to all of the creditors judgment shall be rendered to each creditor for a pro rata amount of the recovery; and that the surety on the bond may pay into court for distribution among the claimants and creditors the full amount of the penalty named in the bond less any amount which the surety may have had to pay to the United States by reason of the execution of said bond, and upon so doing the surety will be relieved from further liability. The bond here in suit was executed in the sum of $32,500 for the protection not only of the United States but of all sub-contractors furnishing labor or material toward the erection of the buildings contracted for without regard to the terms of purchase or employment or whether the subsidiary contracts in that behalf were or were not in existence when the bond was executed. The hardware company is not the only use plaintiff. There are others who have intervened pursuant to law. As shown by the record there were at the time of the filing of the plea and now are four intervening claimants. The plea does not expressly or by implication deny that the intervenors have claims protected by the bond nor does it allege any act on their part or the part of any of them which has discharged the surety from liability on account of the non-payment of the same by Lynch Bros. It is not contended that the binding extension granted to the contractors only by the hardware company discharged or could discharge the surety from the liability it would otherwise have been under to the intervenors. Yet the plea, although in its commencement, through the use of the original title of the action, apparently restricted to the claim of the hardware company, is in fact interposed as a bar to the action with respect to all the intervenors as well as the hardware company, for it concludes, "by means whereof the said Fidelity and Deposit Company of Maryland, surety as aforesaid, was deprived of the protection available to it and was thereby greatly injured and damaged and was and is wholly released and discharged from the condition of the bond declared upon in this action and from all obligations thereunder," &c.

But wholly aside from this last point it does not appear from the plea that the surety was in anywise injured by the extension granted by the hardware company to Lynch Bros. It is not directly or indirectly alleged that at any time during the period of the extension the hardware company knew or had notice of the financial ability of Lynch Bros. or of their becoming insolvent and filing a petition in bankruptcy, or of the payment by the United States to them on or about September 22, 1909, and October 5, 1909, of moneys which had become due to them under the contract, or of a retention by the United States of those moneys for the purposes set forth in the plea, or for any other purpose or purposes, or of the applicability of those moneys at the instance of the surety as alleged in the plea, or of the expenditure or distribution by Lynch Bros. of those moneys, or any part thereof, or of their alleged omission to make payment to persons supplying labor and material in the prosecution of the work contracted

for. And the plea does not directly or indirectly allege that at any time during the period of the extension in question the surety knew or had notice of any of the matters above mentioned, or that until after the expiration of that period the surety was aware of the fact that an extension had been granted by the hardware company, or that Lynch Bros. had agreed to pay the hardware company for materials furnished when and as they should receive payment from the United States. Nor does it appear from the plea that the surety for its own protection made any application to the United States, Lynch Bros. or in any other quarter. Under these circumstances it is idle to contend that the plea shows that the surety changed its position, omitted to take action or was in anywise damnified by the extension.

[3] Further, the plea does not state in form or substance that by reason of the extension granted by the hardware company the surety, if held liable, would sustain loss or be damnified to an amount equal to the claim of the former or to the pro rata share it may be entitled to recover in this action. If it would not suffer damage to such an amount, whatever loss might be proved at a trial by way of mitigation of damages, the plea cannot operate as a bar to the action with respect to that claim. The plea alleges that the surety sustained "great loss and injury" and was "greatly injured and damaged" and indulges in certain hypothetical inferences as to what the surety could have done if it had had notice of the extension, and also avers matters of which both it and the hardware company were ignorant. But from beginning to end there is no allegation of the amount of damage in dollars and cents or relatively to the amount of the claim or pro rata share of the hardware company. In such a case as this the suggestion of hypotheses, contingencies and possibilities of loss cannot avail. For the above reasons the demurrer to the plea must be sustained; but primarily upon the ground that the binding extension given by the hardware company to Lynch Bros. was granted in good faith and for only a reasonable time and the surety cannot be discharged as such by reason of any loss or damage resulting therefrom.