### PITTSBURG–BUFFALO CO. v. AMERICAN FIDELITY CO.

(Circuit Court of Appeals, Third Circuit. February 4, 1915.)

No. 1890.

1. PRINCIPAL AND SURETY ⬥162—DISCHARGE OF SURETY—DEPARTURE FROM CONTRACT—QUESTIONS FOR JURY.

On an issue as to whether a surety on a contract to purchase coal had been discharged by reason of alleged departure, whether an order for coal given by the buyer was one contemplated by and to be performed under the terms of the contract, or whether the order and its acceptance formed a separate and independent contract, on which questions the evidence was in irreconcilable conflict, *held* for the jury.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 442–445; Dec. Dig. ⬥162.]

2. PRINCIPAL AND SURETY ⊂⊃162—CONTRACTS—ALTERATION.

Where a surety for performance of a contract denies liability on the ground that it has been altered, and the evidence as to whether alterations and changes have in fact been made and their nature, is conflicting, whether the contract has been altered, and, if so, whether the alterations are material, are for the jury.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 442–445; Dec. Dig. ⊂⊃162.]

3. PRINCIPAL AND SURETY ⊂⊃99—CONTRACT—ALTERATION—DISCHARGE—"NEW CONTRACT."

Alteration of a contract, in order to discharge a surety, must be such as to transform it into a new and different contract, requiring the concurrence of the parties making the alteration, and a meeting of minds in forming the new undertaking, since a "new contract" means a new agreement, and contemplates action by both parties making it.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 158–161; Dec. Dig. ⊂⊃99.]

4. PRINCIPAL AND SURETY ⊂⊃99—CONTRACTS—DEPARTURE.

Where a secured contract providing for the sale of Annabelle coal did not inhibit the parties from making other contracts for the sale of other coals, the fact that the buyer purchased from and sold for the seller other grades of coal, and that the seller had contracted with the buyer for the sale of coal without notice to the surety, did not constitute departures, so as to relieve the surety from liability.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 158–161; Dec. Dig. ⊂⊃99.]

5. PRINCIPAL AND SURETY ⊂⊃99—CHANGE OF CONTRACT—DEPARTURE.

Where a secured contract for the sale of Annabelle coal placed no territorial restrictions for the sale of coal on the buyer, the fact that the buyer, with the knowledge of the seller, purchased its coal for export and for delivery outside the territory prescribed in the contract, and went into the export business in competition with the seller, were not such departures as would relieve the surety from liability.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 158–161; Dec. Dig. ⊂⊃99.]

6. PRINCIPAL AND SURETY ⊂⊃162—CHANGE OF CONTRACT—DEPARTURE.

Where a secured contract for the sale of Annabelle coal provided that the buyer should act as the seller's sales agent, and should make sales at prices fixed by the seller on specified commissions, whether sales made by the buyer at different prices constituted a departure, so as to relieve the surety from liability, depended on whether the coal so sold was Annabelle coal, and whether such sales were of coal delivered under the contract and made with the selling company's knowledge, which questions were for the jury.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 442–445; Dec. Dig. ⊂⊃162.]

7. PRINCIPAL AND SURETY ⊂⊃99—CHANGE OF CONTRACT—DEPARTURE.

Where a secured contract for the sale of coal by plaintiff to D. & Co. provided that the latter should take monthly 50 per cent. of the output of the Annabelle mines, but contained no penalty for a breach of such provision, such breach merely restored to plaintiff the right to enter D. & Co.'s otherwise exclusive territory and sell in competition with them the portions of the coal which they failed to take under their contract, so that a breach of such covenant did not constitute a departure from or an alteration of the contract terms, relieving the surety.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 158–161; Dec. Dig. ⊂⊃99.

Discharge of surety by alteration of instrument, see note to Zeigler v. Hallahan, 66 C. C. A. 6.]

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**8. PRINCIPAL AND. SURETY ☞99—CHANGE OF CONTRACT—DEPARTURE.**

Whether plaintiff's act in accepting notes from D. & Co. for coal delivered under a secured sales agency contract, instead of requiring payment on the 20th of the month for coal sold in the previous month, as the contract provided, constituted a departure relieving the surety from liability, depended on whether the notes were given and accepted in payment, and whether the change in the manner of payment so operated to affect the rights and liabilities of the surety as to discharge it from liability under the relaxation of the rule of strictissimi juris, when applied to undertakings of corporate sureties for profit, the first of which questions was for the jury.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 158–161; Dec. Dig. ☞99.]

**9. PRINCIPAL AND SURETY ☞99—CHANGE OF CONTRACT—DEPARTURE.**

Where a secured sales agency contract only prevented plaintiff from selling Annabelle coal in the territory given to D. & Co., the fact that plaintiff shipped other coal into D. & Co.'s territory did not constitute a departure from the contract, relieving the surety.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 158–161; Dec. Dig. ☞99.]

**10. PRINCIPAL AND SURETY ☞99—CHANGE OF CONTRACT—DEPARTURE.**

Where a secured sales agency contract applied solely to Annabelle coal, the fact that the selling agents purchased coke produced from other mines, and that the coal company sold coke to such agents under orders providing different terms of profit and rates of payment than those specified in the contract, did not constitute a departure.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 158–161; Dec. Dig. ☞99.]

In Error to the District Court of the United States for the Western District of Pennsylvania; Wm. H. Hunt, Judge.

Action by the Pittsburg-Buffalo Company against the American Fidelity Company. Judgment for defendant, and plaintiff brings error. Reversed, and new trial granted.

William A. Stone and E. O. Golden, both of Pittsburgh, Pa., for plaintiff in error.

Richard H. Hawkins, of Pittsburgh, Pa., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. The Pittsburg-Buffalo Company, the plaintiff corporation, hereafter referred to as the Coal Company, was in the business of selling coal for mine operators, and was under contract to provide a market for and to sell the entire product of the Annabelle mines. J. K. Dimmick & Co. was a copartnership engaged in the business of selling coal chiefly to consumers. On January 20, 1912, the Coal Company entered into a contract with Dimmick & Co., whereby the former appointed the latter its exclusive agent for the sale of coal from the Annabelle mines, in territory which may be described as the New England states, and also its agent for the sale of the same coal in a portion of the Middle Atlantic states, reserving to itself the right to sell Annabelle coal in the latter district directly through certain of its agencies then established, and to fill orders for Annabelle coal for sale outside of the districts described, and to name

the price at which Annabelle coal should be sold in the two districts, below which neither party could make sales. The terms of sales and payment contemplated that Dimmick & Co. should send orders to the Coal Company, and that the coal, when shipped, should be billed to Dimmick & Co. at the selling price thereof, less the commission stipulated, and that thereafter Dimmick & Co. should rebill the coal to their customers, guaranteeing payment therefor. Dimmick & Co. undertook to purchase from the Coal Company enough coal each month to enable the Annabelle mines to run at least 50 per cent. of their capacity; otherwise, the Coal Company reserved to itself the right to enter Dimmick & Co.'s territory and sell Annabelle coal. The period of the contract extended from the date of its execution to March 31, 1915.

To secure the full performance of the contract, each party executed and delivered to the other a bond in the sum of $25,000, upon which the American Fidelity Company, the defendant in this action, and hereafter referred to as the Surety Company, became surety. Upon the bond executed by Dimmick & Co. and the Surety Company to the Coal Company, this action was brought. The breaches of the contract relied upon for recovery on the bond had their origin in an order made on November 9, 1912, by Dimmick & Co. upon the Coal Company, and by the latter accepted and in part performed. By this order Dimmick & Co. directed the Coal Company to ship and consign to them at Curtis Bay Piers, Baltimore, Md., 30,000 tons of Annabelle coal in monthly installments of 10,000 tons, beginning December 1st thereafter, at the net price of $1.40 per ton, payment on the 20th of the month following, confirming an agreement previously made between officers of the two companies. In December, 1912, 10,000 tons were shipped, and on January 2, 1913, notes were given in an amount equal to the total purchase price thereof, maturing upon dates beyond January 20, 1913, and when due were paid. During the month of January, 1913, pursuant to the same order, a quantity of coal was shipped by the Coal Company to Dimmick & Co., for which the Coal Company was not paid, and for which it claimed payment in the sum of $9,390.07, which amount represents the selling price of the coal, less commissions retained, pursuant to the contract. Thereafter Dimmick & Co., notified the Coal Company to cease shipments and refused to take more coal. The Coal Company was able to sell for the account of Dimmick & Co. only a portion of the coal contracted for delivery in the month of February, and thereby sustained a loss of $2,762.62. This sum, and the aforementioned sum of $9,390.07, make a total sum of $12,152.69, which, together with interest thereon from March 20, 1913, is the amount which the Coal Company seeks to recover in this action.

The Surety Company defended this action upon the ground that the order made and accepted on November 9, 1912, and in part performed by both parties, was not made under the contract upon which it was surety, or, if under that contract, it was made after the terms thereof had been departed from and materially altered and varied, without notice to it, thereby discharging it from its surety obligation. The par-

ticulars in which it claims departure, excepting the last, are acts.exclusively attributed to Dimmick & Co., and are enumerated as follows: That Dimmick & Co. (1) purchased from and sold for the Coal Company other grades of coal than the Annabelle coal; (2) purchased plaintiff's coal for export, and delivery outside of the prescribed territory; (3) sold coal at prices not fixed by the Coal Company, in some instances yielding profits in excess of the commission stipulated, and in others causing losses; (4) went into the export business in competition with the Coal Company; (5) instead of acting as sales agent, became speculators, selling coal short and for future deliveries; (6) did not take monthly 50 per cent. of the output of the Annabelle mines; and (7) that, instead of settling for coal sold each month upon the 20th of the following month, gave notes which were accepted by the Coal Company. Based upon the argument that these acts were departures from the contract, and that therefore the Surety Company was discharged, the Surety Company moved that the jury be directed to render a verdict for the defendant. The motion was allowed, and the verdict directed.

In denying a motion for a new trial, and entering judgment on the verdict, the court delivered an opinion wherein it appears that the grounds upon which it directed a verdict for the defendant were acts which, though related to those of Dimmick & Co., were more directly attributed to the Coal Company, and for convenience are named and enumerated as follows: The Coal Company (8) entered into other contracts with Dimmick & Co. for the sale of coal, without notice to the surety; (9) shipped coal into the designated territory from other mines than from the Annabelle mines; (10) shipped coal and coke upon terms as to profits and rates of payment different from those fixed by the contract; and (11) instead of requiring Dimmick & Co. to make payments on the 20th of each month, the Coal Company permitted them to make payments at different periods and by promissory notes.

The one question before the court on review, based upon the one error assigned, is whether the trial court erred in directing the jury to return a verdict for the defendant. At the trial there was no dispute about the execution of the contract of January 20, 1912, the delivery and acceptance of the order of November 9, 1912, the amount of coal delivered pursuant thereto, its price, the failure of Dimmick & Co. to make payment therefor, and the result in damages to the Coal Company. The testimony was addressed principally to questions whether certain acts of Dimmick & Co. were departures from the contract, whether the Coal Company had knowledge thereof or gave assent thereto, whether contracts for the sale of coal other than Annabelle coal were made between the two companies, and whether Dimmick & Co. sold coal at prices other than at the price stipulated, and disposed of the same for export and in territory other than that described in the contract. Of the several questions involved in the confusion of the controversy, there are three which in our opinion stand out boldly.

[1] The first is whether the order of November 9, 1912, was one of a number of orders contemplated by and to be performed under

the terms of the contract of January 20, 1912, for the faithful performance of which on the part of Dimmick & Co. the Surety Company was primarily bound, or whether that order and its acceptance formed a separate and independent contract, in no way related to nor intended to be performed under the terms of the contract of January 20, 1912, for the faithful performance of which the Surety Company was never bound. At the trial the Surety Company did not raise this question in this precise form, being rather inclined to treat what was done as departures from the contract on which the Surety Company was surety; nevertheless the testimony presents this question, and in presenting it the testimony discloses irreconcilable conflict. We are of opinion that the court below erred in not submitting to the jury this question as one preliminary to all others, for, had the jury found that the order of November 9, 1912, was in itself a separate and independent contract—that is, a contract for the performance of which the defendant surety company never became surety—there would have been no occasion to have considered any other question.

We find two other questions raised by the testimony. Assuming that the jury found that the order of November 9, 1912, and its acceptance, did not constitute a separate and independent contract, but was an order made or attempted to be made under the terms of the contract of January 20, 1912, then the second question is whether the parties to the contract had by their words or acts altered or changed its terms, and, if such was found to have been the case, then, third, whether the alterations or changes extended to the essential features of the contract, and were of a materiality that discharged the surety from its liability.

[2] Upon the question whether alterations and changes had in fact been made, and, if made, what were their nature and extent, the testimony was unquestionably conflicting. Whether a contract has been altered or changed, and the character and extent of the alterations made, if any, are questions of fact to be determined by the jury from the testimony when conflicting, though the materiality of such alterations, when established, is a question of law for the court. We think the court below erred in withholding these questions of fact from the jury. Before this court, as well as before the court below, there was presented no novel question of the law of suretyship, and in considering the law which at present is applicable to this case we need make reference to but several of the many decisions cited. This court held in the case of Zeigler v. Hallahan, 131 Fed. 205, 66 C. C. A. 1, that:

"In determining whether a surety is discharged by an alteration of the principal contract without his consent, the question is not whether the change was or could be prejudicial to him, but whether it effected a material alteration of the agreement to which his undertaking of suretyship related; and, if it did, he is discharged, even though the change may have been beneficial to him."

In the same case, Judge Dallas, speaking for this court and quoting from Cross v. Allen, 141 U. S. 537, 12 Sup. Ct. 71, 35 L. Ed. 843, stated the rule to be:

"That any material change in the contract on which he is a surety, made by the principal parties to it without his assent, discharges the surety, even though he may be benefited by such change; the reason being that he has not assented to the contract in its altered form, and has a right to stand upon the very terms of his undertaking."

In Bensinger v. Wren, 100 Pa. 503, the court said that:

A surety "has a right to stand upon the very terms of his obligation and is bound no further. Any unauthorized variation in an agreement which a surety has signed, that may * * * substitute an agreement different from that which he came into, discharges him." Miller v. Stewart, 9 Wheat. 680, 6 L. Ed. 189; Smith v. U. S., 2 Wall. 219, 17 L. Ed. 788.

[3] There is no question concerning this law. The only question is whether this law applies to the facts of this case, and the only way to solve that question is to submit the case to a jury, in order that from the conflict of the testimony it may be determined whether the parties to this contract did in truth make alterations in it, and, if so, to ascertain their nature and extent. The theory of the discharge of a surety from a contract which has been altered is based upon the fact that he is not a party to the new contract created by the alteration. If by alteration an old contract is transformed into a new or different one, thereby discharging a surety, a concurrence of the parties in making the alteration and in the meeting of their minds in forming the new undertaking must have been present. A new contract means a new agreement, and a new agreement between parties to an old one contemplates the action of both parties in making it. Therefore we are of opinion that the court below erred in failing to submit to the jury the question whether the terms of the contract to which the obligation of the Surety Company related had in point of fact been altered by the parties, and, if found so to have been altered, then in failing to submit to the jury, under appropriate instructions upon the law, the question whether the alteration was made by the act or with the consent of both parties with respect to an essential feature, thereby changing the contract from what it was when the Surety Company undertook to assure its performance.

The Surety Company, however, takes a position far in advance of this, and maintains, with respect to certain matters, that by the conduct of Dimmick & Co., without regard to the knowledge of or acquiescence therein on the part of the Coal Company, it is nevertheless discharged from its obligation of suretyship, and asks us to hold as a matter of law that if Dimmick & Co. sold a ton of Annabelle coal outside of their prescribed territory, or at a price that yielded more or less profit than that fixed by the commission named in the contract, though the Coal Company neither assented to, acquiesced in, nor was informed of such a sale, an alteration in the contract was made, though made by Dimmick & Co. alone, which released the Surety Company from its obligation to the Coal Company upon the defaulted payment of Dimmick & Co. for coal purchased, contending that by its obligation of surety it had not undertaken to protect and save harmless the Coal Company from acts of Dimmick & Co. done otherwise than in the manner contemplated by the contract.

[4] The charge by the Surety Company (1) that Dimmick & Co. purchased from and sold for the Coal Company other grades of coal than Annabelle coal, and the ground for the court's refusal to grant a new trial (8) that the Coal Company had entered into other contracts with Dimmick & Co. for the sale of coal without notice to the surety, do not constitute departures, for nowhere in the contract do we find anything that inhibited the Coal Company and Dimmick & Co. making other contracts for the sale of other coal.

[5] The departures charged against Dimmick & Co., even with the knowledge of the Coal Company (2) that Dimmick & Co. purchased plaintiff's coal for export, and for delivery outside of the prescribed territory, and thereby (4) went into the export business in competition with the Coal Company, cannot be construed as departures from the original contract, because there is nothing in the contract which forbade or hindered Dimmick & Co. buying coal for export or for delivery outside of the prescribed districts. While by the contract the Coal Company surrendered the right to sell Annabelle Coal in the New England district, and with certain exceptions in the Middle Atlantic district, it placed no territorial restrictions for the sale of coal upon Dimmick & Co.

[6] Whether the fact, if true, (3) that Dimmick & Co. sold coal at prices not fixed by the Coal Company, yielding profits in excess of the commission stipulated, or at prices resulting in losses, constitutes a departure, depends first upon a solution of the disputed question whether such coal was Annabelle coal, and, if found so to be, then of the question whether such sales were made of coal delivered under the contract and made with the consent and the knowledge of the Coal Company. This is a matter for a jury under appropriate instructions upon the law. If the acts charged to Dimmick & Co. as departures (5) that instead of acting as sales agent for the Coal Company they became speculators, selling coal short and for future deliveries, relate to coal other than Annabelle coal purchased under the contract, then clearly there is nothing within the purview of the contract which prevented Dimmick & Co. indulging in such practices. If the acts complained of relate to Annabelle coal purchased under the contract and sold in a manner different from that prescribed by its terms, the question of departure from the contract is to be determined only by the jury upon proper instructions from the court as to the materiality of the departure and its prejudice to the corporate surety.

[7] The fact, if such it be, that Dimmick & Co. (6) did not take monthly 50 per cent. of the output of the Annabelle mines, does not constitute a departure. The covenant provides no penalty for a breach for which resort may be made either to Dimmick & Co. or to their surety. It simply restores to the Coal Company the right to enter the otherwise exclusive territory of Dimmick & Co. and sell in competition with them the portions of the coal which they failed to take under their covenant. A breach of this covenant is not a departure from nor an alteration of the terms of the contract. It is a breach of one of its provisions, immaterial to the surety.

[8] The principal departure in or alteration of the contract charged by the Surety Company against both parties and found by the court to

have been disclosed by the testimony is (7) (11) that on different occasions, instead of paying on the 20th of the month for coal sold in the previous month, Dimmick & Co. gave and the Coal Company accepted notes. Undoubtedly, whatever was done in the giving and accepting of notes for the coal deliveries of the previous month was done by the concurring acts of the two parties; but whether the notes were given and accepted in payment therefor, and for that reason discharged the surety from its obligation, is a question of fact to be found by the jury, under instructions by the court upon the law, first, whether the transaction constituted payment (30 Cyc. 1194–1201; Bouvier's Law Dictionary, title Payment); and if found to be payment in law, then, second, whether the change in the manner of payment from that prescribed by the contract, though without injury to the surety resulting therefrom, so operated to affect the rights and liabilities of the surety as to discharge it from its obligation, under the relaxation of the rule of strictissimi juris, when applied to the undertakings of corporate sureties for profit. Title Guarantee & Surety Co. v. Baglin (3d Circuit) 178 Fed. 682, 102 C. C. A. 182; Fidelity & Guarantee Co. v. U. S. (3d Circuit) 178 Fed. 692, 102 C. C. A. 192; Atlantic Trust Co. v. Laurinburg (4th Circuit) 163 Fed. 695, 90 C. C. A. 279; Guaranty Co. v. Pressed Brick Co., 191 U. S. 416, 24 Sup. Ct. 142, 48 L. Ed. 242.

[9] The ground for the court's refusal to grant a new trial, (9) that the Coal Company had shipped coal from other mines than from the Annabelle mines to the designated territory of Dimmick & Co., is an act not prohibited by the contract. The restrictions which the Coal Company placed upon itself with regard to selling coal in the territory given to Dimmick & Co. extended only to the sale of Annabelle coal.

[10] The remaining ground for the court's refusal to grant a new trial, (10) that the Coal Company shipped coal and coke upon terms as to profits and rates of payment different from those fixed by the contract, may or may not be a variation of the terms of the contract properly construed. In the first place, the departure alleged by the Surety Company (1) that Dimmick & Co. purchased coke produced from other mines, and the departure found by the court, (10) that the Coal Company sold coke to Dimmick & Co. under orders providing different terms of profits and rates of payment than provided by the contract, are wholly without point, because there is nothing in the contract relating to or prohibiting the sale and purchase of coke.

The contention that the Coal Company shipped coal to Dimmick & Co. upon terms as to profits and rates of payment different from those prescribed by the contract presents questions for the jury, first, whether the coal so shipped was Annabelle coal; second, whether such shipments were made under the contract, and whether the terms as to prices and payments were varied from the terms thereof; and, if found so to be, then, under proper instructions from the court upon the law, third, whether the same were material changes in the essential features of the contract. In giving to certain of the terms of the contract in suit the interpretations which appear in this opinion, we have restricted our consideration to those phases of it upon which directly bear the questions presented for review. We disclaim an at-

tempt or an intention to otherwise or to a greater extent construe its provisions.

The judgment below is reversed, and a new venire is awarded.