AMERICAN BONDING CO. OF BALTIMORE et al. v. UNITED STATES, to Use of FRANCINI et al.

(Circuit Court of Appeals, Third Circuit. June 16, 1916.)

No. 2077.

1. UNITED STATES ☜67(3)—BONDS OF CONTRACTORS—ACTIONS—"FINAL SETTLEMENT."

Under Act Aug. 13, 1894, c. 280, 28 Stat. 278, as amended by Act Feb. 24, 1905, c. 778, 33 Stat. 811 (Comp. St. 1913, § 6923), requiring government contractors to give bonds to pay all persons supplying labor or material, and allowing the government alone to sue during the first six months after final settlement, and authorizing suits thereafter in the name of the government for the use of materialmen and laborers, the final settlement may be accepted as the date on which the Supervising Architect of the Treasury recommended settlement which was made, and not as the date of payment or the actual date that the settlement recommended was approved by the Secretary of the Treasury, this being particularly so where contractors and others were informed that the date on which the recommendation was made was the date of settlement.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. ☜67(3).

For other definitions, see Words and Phrases, First and Second Series, Final Settlement.]

2. PRINCIPAL AND SURETY ☜143—ACTIONS—DEFENSES AVAILABLE.

A surety may usually set up any defense of which his principal could take advantage.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. § 392; Dec. Dig. ☜143.]

3. PRINCIPAL AND SURETY ☜99—RIGHTS OF SURETY—COMMERCIAL SURETY.

Where the measure of a surety's liability is fixed, any change will, as to an individual surety, relieve from liability; but the rule is otherwise as to a commercial surety, who must show injury by the change to be relieved.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 158–161; Dec. Dig. ☜99.]

4. PRINCIPAL AND SURETY ☜97—DEFENSES—CHANGE OF LIABILITY.

Defendant became surety on the bond of a federal contractor, which was conditioned that the contractor should pay claims of laborers and materialmen. The contract with the subcontractor for marble work thereafter entered into provided that the subcontractor should receive partial payments according to the marble furnished, as the principal contractor received partial payments from the government. Instead the principal contractor gave notes to the subcontractor, which inclosed and discounted them and also made cash payments nearly equaling the amounts due under the contract. *Held* that, though the principal contractor refused to carry out his contract, such mode of payment injured the surety, because

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

casting a greater burden on the surety, by creating a contingent liability on the notes, and depriving it of the benefit of partial payments.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 146–168; Dec. Dig. ☞97.]

In Error to the District Court of the United States for the Middle District of Pennsylvania; Chas. B. Witmer, District Judge.

Action by the United States, for the use of Cæsar Francini, the Pennsylvania Marble & Granite Company, and others, against the American Bonding Company of Baltimore and others. There was a judgment for use plaintiffs, and defendants bring error. Judgment for all plaintiffs affirmed, save as to the Pennsylvania Marble & Granite Company, and reversed and remanded as to it.

F. B. Bracken, of Philadelphia, Pa. (Welles & Torrey, of Scranton, Pa., of counsel), for plaintiffs in error.

R. Stuart Smith, of Philadelphia, Pa. (O'Brien & Kelly, of Scranton, Pa., and Morgan, Lewis & Bockius, of Philadelphia, Pa., of counsel), for defendants in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. [1] In October, 1910, Mark P. Wells contracted with the United States to build a post office at York, Pa., and gave the bond required by the act of 1905, conditioned, inter alia, to pay all persons supplying labor or material. The building was finished and accepted, a settlement was made with Wells, and the balance due him was paid over. But, as several subcontractors were still unpaid, one of them brought the present suit against Wells and his surety on February 4, 1914, and others intervened soon afterward. This writ is taken by the surety only.

The first question to be decided is whether the suit was premature; i. e., whether it was brought before the six months had expired within the United States alone has the right to sue. U. S. v. McCord, 233 U. S. 157, 34 Sup. Ct. 550, 58 L. Ed. 893; Stitzer v. U. S. (C. C. A. 3d) 182 Fed. 513, 105 C. C. A. 51. On this point, the facts are as follows:

On August 2, 1913, the Supervising Architect of the Treasury addressed a letter to the Secretary recommending a settlement with Wells upon certain terms, and this settlement, slightly changed, was approved by the Assistant Secretary, who appended the following memorandum without date:

"Approved and damages charged in part as recommended.
  "By direction of the Secretary:
                         "Sherman Allen, Assistant Secretary."

The undisputed evidence shows that this memorandum was not signed before August 9, and that the balance thus found due was not paid before August 16. Now, if this were all, it might be argued with some force that August 9 was the earliest date assignable for the "settlement," and therefore that the action was brought several days too

soon. But other evidence leads to the opposite conclusion. On the whole case it appears that (since September 12, 1912, at least) the Treasury "treats as the date of final settlement mentioned in said acts" (of 1894 and 1905) "the date on which the Department approves the basis of settlement under such contract recommended by the Supervising Architect, and orders payment accordingly." This language is contained in Department Circular No. 45, bearing the date just mentioned, and this circular was sent to some, perhaps to all, of the subcontractors. Moreover, it was proved that, when several of these contractors asked the Department when settlement had been made with Wells, the Treasury replied, in December, 1913, or January, 1914, that "final settlement under the contract referred to above was authorized August 2, 1913." It was also shown that the following official indorsements appeared upon the contract: "Final payment authorized Aug. 2/13," and "Guarantee expires 8/2/15." The latter indorsement refers to a clause in the specifications guaranteeing certain work for a period of two years. No suit has been brought by the government. Clearly, therefore, the Department adopted August 2, 1913, as the date of final settlement, and so informed the subcontractors— among them, the firm by whom the suit was begun on February 4.

At the time of the trial the courts were not in agreement in their answers to the question, What constitutes a "settlement" between a contractor and the government? But since then the question has been answered definitely in Illinois Surety Company v. United States, for use of Peeler (decided Feb. 21, 1916) 240 U. S. 214, 36 Sup. Ct. 321, 60 L. Ed. 609. As that case has not yet been regularly reported, we quote from it freely. There the suit was brought on March 4, 1913. At the trial it appeared that on August 21, 1912, the Treasury Department had stated and determined what balance was due the contractor, although the money had not been paid until September 11. The surety contended that the suit was premature, because six months had not elapsed since the date of payment. But the Supreme Court held that August 21 was to be taken as the date of final settlement, and in the course of the discussion used the following language:

"It was evidently the purpose of the act of 1905 to remedy the defect in the act of 1894 by assuring to the United States adequate opportunity to enforce its demand against the contractor's surety, and priority with respect to such demand. * * * With this object in view—to protect the priority of the United States, and at the same time to give a remedy to materialmen and laborers on the contractor's bond and a reasonable time to prosecute it (A. Bryant Co. v. N. Y. Steamfitting Co., 235 U. S. 327, 337 [35 Sup. Ct. 108, 59 L. Ed. 253])—it was natural that the time allowed exclusively for action by the government should begin to run when the contract had been completed, and the government, in its final adjustment and settlement according to established administrative methods, had determined what amount, if any, was due. Then the government would have ascertained the amount of its claim, if it had one, and could bring suit, if it desired. As such determinations are regularly made in the course of administration, nothing would seem to be gained by postponing the date, from which to reckon the six months, to the time of payment. Indeed, if an amount were found to be due from the contractor, and he was insolvent, there might be no payment; and, if payment were essential, there would be no date from which the time for the bringing of the creditors' action could be computed.

"The pivotal words are not 'final payment,' but 'final settlement,' and, in view of the significance of the latter term in administrative practice, it is hardly likely that it would have been used had it been intended to denote payment [citing cases]. The word 'settlement,' in connection with public transactions and accounts, has been used from the beginning to describe administrative determination of the amount due [referring to numerous statutes upon this subject]. * * *

"We should not say, of course, that instances may not be found in which the word 'settlement' has been used in acts of Congress in other senses, or in the sense of 'payment.' But it is apparent that the word 'settlement,' in connection with public contracts and accounts, which are the subject of prescribed scrutiny for the purpose of ascertaining the rights and obligations of the United States, has a well-defined meaning as denoting the appropriate administrative determination with respect to the amount due. We think that the words 'final settlement' in the act of 1905 had reference to the time of this determination, when, so far as the government was concerned, the amount which it was finally bound to pay or entitled to receive was fixed administratively by the proper authority. It is manifestly of the utmost importance that there should be no uncertainty in the time from which the six months period runs. The time of the final administrative determination of the amount due is a definite time, fixed by public record and readily ascertained. As an administrative matter, it does not depend upon the consent or agreement of the other party to the contract or account. The authority to make it may not be suspended, or held in abeyance, by refusal to agree. Whether the amount so fixed is due, in law and fact, undoubtedly remains a question to be adjudicated, if properly raised in judicial proceedings, but this does not affect the running of the time for bringing action under the statutory provision.

"In the present case, the construction of the building was in charge of the Secretary of the Treasury and under the general supervision of the Supervising Architect. The Secretary of the Treasury was authorized to remit the whole or any part of the stipulated liquidated damages as in his discretion might be just and equitable. 32 Stat. 326 [Comp. St. 1913, § 6922]. On August 21, 1912, the Supervising Architect, having received the certificate of the chief of the technical division of the office that all work embraced in the contract had been satisfactorily completed, made his statement of the amount finally due, recommending that only the actual damage (as stated) be charged against the contractor, and that the proper voucher should be issued in favor of the contractor for the balance, to wit, $3,999.01. And on the same date this recommendation was approved and actual damages charged accordingly by direction of the Secretary of the Treasury. This, in our judgment, was the 'final settlement' of the contract within the meaning of the act. We understand that the administrative construction of the act has been to the same effect. The regulation of the Treasury Department, as it appears from its circular issued for the information of persons interested in claims for material and labor supplied in the prosecution of work on buildings under the control of that Department (Dept. Circ. No. 45, Sept. 12, 1912), is as follows: 'The Department treats as the date of final settlement mentioned in said acts' (referring to the acts of 1894 and 1905, supra) 'the date on which the Department approves the basis of settlement under such contract recommended by the Supervising Architect, and orders payment accordingly.' "

The precise question now before us is whether the Department should be held to the date on which it actually stated the terms of "settlement," or whether it might adopt the earlier date on which the settlement was recommended by the proper official. We see no sufficient ground for confining the government to the later day. If, for reasons of convenience or for any other administrative reason, the Department sees proper to adopt the date of recommendation—and especially if it furnish that date to others, who act upon the information as true—we perceive no principle that calls upon the court to set the Department's action aside. On the contrary, we see no objection

to allowing the government a discretion in this matter. The essential thing is that some date shall be fixed, so as to do away with the need of further inquiry, and to make it easy to ascertain merely from the Department's record just when the six months period will expire. Unless adverse rights should require the date of actual signing to be ascertained, we think the Department's own choice may safely be accepted as a final decision of the question. It is not irrelevant to observe that, unless adverse rights be involved, the formal date of a deed or a mortgage is continually accepted as the time when the instrument takes effect, in spite of the fact that a later date is in truth the time when the instrument was actually executed.

The District Court was right in holding that the suit had not been brought too soon.

[2-4] 2. The only other subject that needs consideration is the claim of the Pennsylvania Marble & Granite Company for a balance of $31,-200.60, on which a verdict and judgment of $26.200 have been rendered. The company agreed to deliver the marble at York for $75,000, to be paid as follows:

"When payments are received by the said M. P. Wells, proportional amount of same to be paid to said Pennsylvania Marble & Granite Company in proportion to the amount of their work done, reserving therefrom 20 per cent. until the final payment shall be made to said M. P. Wells by said United States of America. Said final payment, with any addition thereto or abatement therefrom in manner herein provided, will be paid to the said Pennsylvania Marble & Granite Company, their executors, administrators, or assigns, upon a full compliance with this contract," etc.

These terms were not observed, but instead thereof the Marble Company from an early date in the transaction agreed to another method, accepted numerous notes from Wells for such amounts as were agreed upon from time to time—these amounts differing from the sums that would have been due under the paragraph just quoted —and discounted the notes at several banks. These notes were often renewed, the extensions sometimes being as much as a year, and one of them at least continuing after Wells had finished his contract and had made final settlement thereunder. Money also—nearly $44,000— was paid by Wells at irregular intervals, and these payments (except $4,000, and certain money paid by him for freight) were applied upon the notes in bank. At the time of trial, the banks (who were innocent holders) still held unpaid notes to a larger amount than the balance claimed by the Marble Company. There had been a good deal of delay in finishing the marble work, and the Bonding Company, claiming that the delay was chargeable to the Marble Company, set off, the damages thus suffered by Wells against the balance sued for. The Bonding Company also defended on the ground that the notes given by Wells were accepted as payments by the Marble Company, and asserted still further that these note transactions (whether they were payments or not) so changed the agreement between Wells and the Marble Company as to relieve the Bonding Company from liability.

The verdict has decided that the notes were not given and accepted as payment; and has also decided that the Marble Company was liable to some extent for the delay—an allowance of $5,000 being

made on this account. Concerning these two matters, no dispute now exists. The questions still open are: (a) Whether the note transactions altered the agreement between Wells and the Marble Company to the Bonding Company's prejudice; and (b) to what extent, if at all, the fact that notes are outstanding in the hands of innocent holders should have prevented the Marble Company's recovery. The first of these questions is raised by the Bonding Company in its own right; and the second is raised by the company in the right of Wells, on the ground that a surety may usually set up any defense of which his principal may take advantage.

(a) Was the contract materially changed without the Bonding Company's consent, and was the company prejudiced thereby? The situation of a surety under the act of 1905 has been discussed in Guaranty Co. v. Brick Co., 191 U. S. 416, 24 Sup. Ct. 142, 48 L. Ed. 242. It usually happens—as it happened in the case before us—that the bond is given before the principal contractor agrees with his subcontractors, and therefore before the surety can know the terms of the subcontracts; but, since the surety "deliberately contracts for an uncertain liability, he ought not to complain when that uncertainty becomes certain," and he is in no position to object that these terms are of one kind rather than another, at least if they be usual and not unreasonable. Assuming their reasonableness, however, it is certainly true that, after the terms have been agreed upon, the measure of the surety's liability is thereby fixed, and, in the case of an individual surety, a material change without his consent will relieve him from liability. This rule is familiar, but of recent years the courts have qualified its application to companies that make a business of guaranty insurance. We need not stop to state the reasons for this qualification; we take note of the fact that such companies are not relieved by such a change in the contract as would relieve an individual surety, unless the change has done them harm. Atlantic Trust & Deposit Co. v. Laurinburg (C. C. A. 4th) 163 Fed. 691, 90 C. C. A. 274; Fidelity Co. v. United States (C. C. A. 3d) 178 Fed. 692, 102 C. C. A. 192; Pittsburgh-Buffalo Co. v. American Co. (C. C. A. 3d) 219 Fed. 826, 135 C. C. A. 488; U. S. v. Lynch (D. C.) 192 Fed. 364. That the terms of payment here were materially changed is beyond dispute. Indeed, it appeared without contradiction that they were not observed at all. The paragraph quoted from the subcontract contemplates that, when Wells should receive payments from the United States (these were regularly made and were based upon monthly estimates by the engineer in charge of the work), he should pay the Marble Company a proportional amount of the money so received, reserving 20 per cent. until the government should make final payment. The stone began to arrive in March or April, 1911, and early in June the Marble Company would have been entitled to receive about $2,400 in cash. Instead, it took and discounted a note of $9,050. By the middle of September the company had received (and discounted) notes for nearly $25,000 and $3,000 in cash, and had credited Wells with about $1,250 additional for freight paid by him. At this time, however, he had received from the United States more than $20,000 on account of the

233 F.—24

marble work, and if the terms of the subcontract had been carried out he ought to have paid to the Marble Company $16,000 of that sum, instead of the $4,250 that had actually been paid. And this is merely an illustration of the way in which the transaction was carried on. Other illustrations are these: In the middle of January, 1912, the company had furnished about $38,000 worth of marble, but at that time Wells had given notes for about $28,500, had paid $17,700 in cash, and had paid about $2,250 for freight. In the middle of May the marble had run up to about $49,000, but in notes, cash, and advances for freights the company had received more than $65,600. And in August, 1912 (a year before final payment), when the marble amounted to $55,400, the notes, $37,500, the cash, about $34,000, and the advances for freight, about $3,200, aggregated nearly $75,000, almost the full amount that Wells had agreed to pay.

We need scarcely discuss the proposition that such a course of dealing materially changed the terms of payment originally agreed upon and guaranteed. These terms were not observed at all, and it is not sufficient to reply that Wells was hampered by insufficient capital, and by the fact that he was carrying on other contracts at the same time and was compelled to use the money for other purposes. Neither is the reply sufficient that the Marble Company could not induce Wells to pay in accordance with the subcontract, and was therefore obliged to accept the notes and such money as it could get, because this was the best way out of the difficulty. The company certainly owed some duty to the surety. It was not obliged to go on with a contract that Wells from the first was refusing to carry out, and if it chose to do so, and to take its chance of getting out whole, it must stand by the risk it deliberately undertook. We do not know whether the Bonding Company knew the terms of the agreement between Wells and the Marble Company; but in any event it does not appear to have had knowledge of what the parties to the agreement were actually doing, and it had a clear right to rest on the assumption that (whatever the terms of payment might be under the subcontract) they would be lived up to without material change, and without injury to itself. In brief, a corporate surety under the act of 1905 is much like the signer of a blank check. Undoubtedly such a man takes a risk; if a larger sum should be inserted than he intended, he must usually accept the situation; but, after the blank has been filled, his liability is fixed, and is not subject to injurious change thereafter.

Was the Bonding Company injured by the complete disregard of the contract terms? This, also, is beyond dispute. One of a subcontractor's safeguards is that he shall receive his due proportion of the contract price while the work is going on, and while payments are being made to the principal contractor; and therefore such proportional payments safeguard the surety also—a protection that is removed, or is at least endangered, if these payments be omitted or be unreasonably deferred. If the terms of this subcontract had been observed, the Marble Company would have been paid 80 per cent in cash as the work went on, and, even if the retained 20 per cent. had not been paid at the end, the loss of the Surety Company would have been no larger

than this percentage. In fact, however, it is confronted now with a judgment for $26,000, and with a contingent liability, which may or may not become an actual liability, of more than $30,000 in addition. For, of course, since the Marble Company has indorsed the notes still outstanding, it may be obliged to take them up; if it is so obliged, and if it does not or cannot recover from Wells (who, as we understand, is insolvent), its claim against the Bonding Company will by so much be increased. In a word, the situation is this: Both elements are present that are necessary to relieve a corporate surety, namely, a material change of its contract without consent and a resulting injury therefrom. As there was no dispute upon either of these subjects, the trial judge should have directed a verdict in favor of the Bonding Company.

If this conclusion be correct, we need not consider question (b) stated above.

As far as this writ of error affects the claims of Cæsar Francini, Pisani Bros., Voska, Foelsch & Sidlo, Incorporated, and the Atchison Revolving Door Company, the judgments in their favor are affirmed; but the judgment in favor of the Pennsylvania Marble & Granite Company is reversed, and a new trial is awarded.