# UNITED STATES v. QUAKER INDUSTRIAL ALCOHOL CORPORATION et al.

## No. 14174.

District Court, E. D. Pennsylvania.

Oct. 17, 1932.

E. Washington Rhodes, Asst. U. S. Atty., and E. W. Wells, U. S. Atty., both of Phil-

adelphia, Pa., and Joseph Millensen, Sp. Asst. to the Atty. Gen.

Michael Serody, of Philadelphia, Pa., for defendants.

### KIRKPATRICK, District Judge.

This suit at law was brought by the United States upon three permit bonds in which the Quaker Industrial Alcohol Corporation was principal and New Amsterdam Casualty Company surety. The bonds were given to guarantee the lawful handling of alcohol in connection with the operation of a distillery, a bonded warehouse and a denaturing plant, respectively, all of which constituted the industrial alcohol plant of the principal. At the outset of the trial the government conceded that there could be no recovery upon either of the first two bonds and the case proceeded and may now be considered as though the third bond were the only one in suit.

█ The trial resulted in a verdict in favor of the plaintiff for $85,400, with interest from October 10, 1928, and the defendant has moved for a new trial. Assuming, as we must, that the jury believed the plaintiff's witnesses, disbelieved the defendant's, and drew all permissible inferences favorable to the plaintiff from the circumstantial evidence, the following proved facts support the verdict:

During the twelve days from December 23, 1926, to January 3, 1927, four freight cars, each loaded with drums of pure alcohol, billed variously as lubricating oil, steel castings, glucose, and agricultural machinery, were located by government agents at four widely separated points in the United States, namely, Rochester, N. Y., Cleveland, Ohio, Detroit, Mich., and Eden Prairie, Minn., and the alcohol seized.

Beside containing alcohol in drums of the same size and kind, these four cars had something else in common. They all appeared, from the railroad records, to have been loaded at Bell Road siding, Philadelphia, between the 8th and the 22d of December, the consignor in three instances being "Di Ganna Oil Company" and in one "Salvage Lumber Company." Inquiry naturally turned toward these shippers, and, not unexpectedly, it turned out that no such concerns existed. However, directly opposite the Bell Road siding was the plant of the Quaker Industrial Alcohol Corporation.

During the period that the alcohol cars were being dispatched from Bell Road, this concern was purchasing pure alcohol, at the rate of a carload (say 5,500 gallons) every day or two from Publicker Commercial Alcohol Company of Philadelphia, which alcohol was being shipped to its bonded warehouse, ostensibly to be kept there until such time as it would be moved into the denaturing plant for manufacture into commercial products. The alcohol came from the Publicker Company in 54-gallon steel drums of the type found in the seized cars (although some witnesses loosely referred to the latter as 50-gallon drums).

█ It began to look as though the Quaker Corporation might have something to do with the shipment of the alcohol in the four seized cars, though the facts so far, of course, did not make the government's case. The theory of the government was that the alcohol in the seized cars had either been received at the bonded warehouse and then reloaded, still in the original drums, by the Quaker Corporation into the same cars and shipped out, or never had been unloaded at all, but the cars of alcohol sent off to their destinations by the Quaker Corporation under false descriptions and in the name of fictitious consignors.

At this point it may be remarked that either of these operations would be a diversion of alcohol for which the bonding company would be liable. The defendant's argument upon this point, carried to its logical limits, is that it was necessary for the government to prove the actual physical entry of the alcohol into the denaturing plant before a recovery could be had. The terms of the bond clearly show that no such narrow limitation was intended. It recites that the Quaker Corporation "intends to transfer to said denaturing plant from bonded warehouses * * * alcohol, free of tax; for denaturing or other tax-free purposes." And the condition is, inter alia, that the Quaker Corporation "shall pay on demand all taxes * * * on all alcohol so removed from the said bonded warehouses and not * * * denatured or removed under lawful permit." Since the Quaker Corporation had only one warehouse of its own, it is obvious that the bond was drawn to guarantee the lawful disposition of all alcohol obtained by it from any lawful source, and was not limited to its transit from its own warehouse to its denaturing plant, which operation consisted merely in rolling the drums through a door or running the alcohol through a short pipe.

Although the evidence of the general scope and character of the principal's business might well support the inference that the specific alcohol diverted had been intended for the denaturing room rather than for sale

from the warehouse, I do not think the government was required to prove that fact. The bond recites intended transfers of alcohol to the principal not only for denaturation but for "other tax-free purposes," which expression includes sales from the warehouse, under permit, and the condition relates to "such alcohol."

■ The fact that another bond was given covering the operation of the warehouse is not controlling as against the plain language adopted by the parties. There is nothing to show that the two bonds were intended to be mutually wholly exclusive, and there was nothing to prevent the parties from entering into two separate bonds in each of which some of the acts guaranteed on the part of the principal were the same.

To return to the evidence: Throughout the period in question, government agents, including a prohibition inspector named Becherer, had been stationed at the Quaker plant. The elaborately detailed reports to the Prohibition Administrator, showing the receipt and lawful disposal of the alcohol, required of these agents were in perfect order. The scheme, therefore, which the government set out to prove included the corrupt co-operation of some of these agents and must have involved Becherer. Upon tracing the cars, it also developed that there were railroad records showing that each of them had been emptied and reloaded again at some intermediate point before it reached the place where it was seized. Of course, if these records were correct, it was unlikely (but not impossible) that the alcohol seized had come all the way from Bell Road siding. The scheme, therefore, also required corrupt or culpably indifferent connivance of various railroad employees and falsification by them of railroad records.

Becherer was a witness at the trial and indignantly denied the imputation that he was corrupt. In fact, so shocking was the suggestion to counsel for the defendant that he moved to withdraw a juror. Becherer also testified that his reports were honest and accurate, and that no diversions could have taken place. Obviously the jury disbelieved him. The railroad employees who made the actual checkup of cars upon which the records of unloading and loading at intermediate points were made were not all called. Those who were evidently did not impress the jury.

■ It required no violent assumption to accept the view that these various agents and employees had been corrupted. The profits of the illegal business carried on must have amounted to staggering sums, and there must have been plenty of money available to bribe the small fry involved. One of the defendant's complaints is that the court in the charge mentioned this situation to the jury. It was not intended to be stated as a fact in evidence, and the jury could hardly have gotten that impression. It was, however, a perfectly proper consideration as bearing on the inherent probability or improbability of a basic and vital fact; namely, the co-operation of the prohibition agents and the railroad men. From any point of view, where the evidence indicates diversions of approximately 300,000 gallons of alcohol during a period of only nine weeks, the suggestion that enough money was being made to pay some bribes was really a rather unnecessary elaboration of the obvious.

It still remained to establish the direct connection of the Quaker Corporation with the diversions.

There was plenty of evidence that the drums in the seized cars were the same drums in which the Publicker Company had shipped alcohol to the Quaker Corporation. One of the drums seized at Rochester bore the full name "Publicker." On another the agents were able to read the word "Quaker." Remnants of transfer stamps scraped from one of the drums seized in the Cleveland cars showed the figures 9124——. These were the first four figures of the numbers of transfer stamps put by the Publicker Company on the drums of alcohol which it shipped to the Quaker Corporation in the very same car. From one of the drums taken from the St. Paul car (unloaded at Eden Prairie) were scraped some pieces of the transfer stamp with the number 137, which is the number of the Quaker plant. On another of the drums the word "Quaker" was fairly distinguishable.

There was, thus, little doubt as to the origin of the alcohol which had been diverted. Evidence that the Quaker Corporation was the real shipper was furnished by a witness named Burns, who was the Reading freight agent in charge of the Bell Road siding. He testified as to an arrangement which had been made with John Freas, president of the Quaker Corporation and owner of 498 of its 500 shares, by which, for a consideration, he agreed to accommodate Mr. Freas during the pertinent period by accepting certain bills of lading "without objection." As a result of this arrangement, Freas, at various times between November 27 and December 22, 1926,

and again between January 7 and February 1, 1927, delivered to Burns some seventy or more bills of lading purporting to show the loading of freight cars with drums of oil, tallow, paint, etc., at Bell Road siding. In most of these bills of lading the legendary Di Ganna Oil Company appeared as the shipper, and in all of the others the shippers were fictitious. The four bills of lading for the original loading of the four seized cars were among them.

The contents of the cars as appearing in these fake bills of lading corresponded in each case as to bulk and packages almost exactly with the drums of alcohol which Becherer's reports showed to have been moved on the same day from the Quaker Corporation's warehouse to its denaturing plant. In a more general way, they corresponded with the amount of alcohol shipped from the Publicker Company and apparently received at the Quaker warehouse.

An interesting coincidence was that the period of inactivity between December 22 and January 7 corresponded with the time when Becherer was on a vacation. Thus all of Freas' active and diversified commerce in oil, lumber, tallow, and paint, etc., from Bell Road siding was carried on while Becherer was at the Quaker plant in charge of the reports to the government of the receipt and disposition of alcohol, and it was temporarily suspended when he was not there.

■ In view of all this, it would seem to be useless to raise the question that the government has not proved the alcohol was diverted by the Quaker Corporation. The evidence that it did, though circumstantial, was overwhelming, and nothing need be added to the above recital of it.

■ As to the quantity of alcohol proved to have been diverted: Assuming a minimum of 50 gallons of alcohol to a drum at the taxable rate of $6.40 per proof gallon, it was only necessary to show the diversion of 141 drums of alcohol in order to sustain a verdict in the amount rendered, namely, $85,400. There were eighty drums of alcohol in the cars seized in Cleveland, and it was admitted by the defendant that the contents of these drums was alcohol. As to the Rochester car, the testimony was that there were "eighty steel drums of alcohol" in the car, and "that we handled each drum and found that it was filled." The testimony does not show that more than one drum was tested, but, in the absence of circumstances showing the fact to be otherwise, the assumption always is that a

witness is testifying as to facts which he knows. If not, the other party can show it by cross-examination. So, where a witness says that he seized eighty drums of alcohol, it will be assumed that he means drums filled with alcohol, and that he knows that it is alcohol. The contrary is for the defendant to show. The eighty drums of supposed glucose in the Detroit car smelled of alcohol when unloaded. And it appears in evidence that agent Cranford "examined the contents and found them to be alcohol." The evidence is ample to sustain the verdict in more than the amount found.

■■ The defendant bonding company argues with great earnestness that it was discharged as surety by reason of a material alteration in the contract which it guaranteed. The facts upon which this argument is based are as follows:

The bond in suit was executed December 8, 1925. It recites the issuance of a permit (No. 106) to Quaker Industrial Alcohol Corporation, and the conditions, in the usual form, are that the permittee "shall not violate the terms of such permit," and further that the principal "shall pay * * * all taxes * * * on all alcohol * * * not so transported, denatured or removed under lawful permit."

At the time the bond was executed, the Quaker Corporation held a basic permit No. 106, issued October 4, 1924, which authorized it to operate a denaturing plant. In November, 1925, in pursuance of a treasury decision, an attempt was made to compel the surrender of all these basic permits at the end of the current year so that thereafter annual applications would have to be made. On December 11, 1925, as a result of this ruling, the Quaker Corporation applied for a new permit for the year 1926, asserting, however, in the letter that, in their view, the existing permit did not expire, that the filing of renewed applications was unnecessary, and that the application was filed with the understanding that such act should not under any circumstances be considered a waiver of any and all rights which it then had under the existing laws and regulations.

This application appears never to have been acted upon, but on December 29, 1925, pending action upon it, a temporary permit, authorizing the operation of the plant for one month, was issued. This temporary permit differed in no way from the original basic permit except as to the term for which it was issued. Thereafter, by letters from

the Prohibition Administrator, this temporary permit was renewed from month to month, and such letters covering the period when the diversions took place.

Even if the Quaker Corporation had unqualifiedly accepted the temporary permit and surrendered its existing permit, I would have no hesitation in holding that the surety was not discharged. It is well established by decisions of the Circuit Court of Appeals of this circuit that even a material change in the terms of the contract guaranteed will not operate to discharge a compensated surety unless the surety is materially injured or prejudiced by the change. U. S. v. U. S. F. & G. Company (C. C.) 178 F. 721; American Bonding Company v. United States (C. C. A.) 233 F. 364. This is also the general rule. Pickens County v. National Surety Company (C. C. A.) 13 F.(2d) 758. In this case, I cannot see how the surety could have been prejudiced in any way by a reduction of the term of the contract for which they had assumed liability, from perpetuity to a period of one month.

But there never was any change in the original contract. The government had no right to alter it without consent of the permittee, and the permittee never consented. As was stated by Judge Woolley in Pittsburgh-Buffalo Company v. American Fidelity Company (C. C. A.) 219 F. 818, 824: "If by alteration an old contract is transformed into a new or different one, thereby discharging a surety, a concurrence of the parties in making the alteration and in the meeting of their minds informing the new undertaking must have been present. A new contract, means a new agreement, and a new agreement between parties to an old one contemplates the action of both parties in making it." Obviously, there was no agreement of meeting of minds here. The Prohibition Administrator announced that he proposed (illegally) to terminate the rights of the permittee. The mere fact that the permittee acquiesced in this illegal action only to the extent of accepting a new permit does not indicate any meeting of minds as to the surrender of the old one. The application for the issuance of the new permit was not in any way inconsistent with the permittee's assertion that the old one was in force. If, instead of issuing a temporary permit which authorized the permittee to carry on its business exactly as usual, the Administrator had withheld alcohol until the old one was surrendered, a situation might have arisen where the permittee would have been compelled either to stand on its rights under the old permit or surrender them. But the fact that the permittee allowed an additional permit to issue, still claiming that the old one was in force and that the abrogation of it was illegal, cannot be said to be the formation of a new contract relationship.

Rule for a new trial is discharged, and judgment may be entered for the plaintiff upon the verdict.