New York P. & B. Supplies Co. *v.* Aetna Casualty & Surety Co.

## NEW YORK PLUMBING AND BUILDING SUPPLIES COMPANY *vs.* THE AETNA CASUALTY AND SURETY COMPANY.

Third Judicial District, Bridgeport, April Term, 1926.

WHEELER, C. J., CURTIS, MALTBIE, HAINES and HINMAN, Js.

To meet the plaintiff's requirement that it be protected against possible loss in a proposed transaction which involved the purchase by it, upon trade acceptances, of a quantity of wall plaster from the G. Co., the latter's president secured from the defendant a bond for $14,000, executed to the plaintiff as obligee, which recited that the plaintiff "has given" trade acceptances amounting to that sum to cover the purchase of one thousand tons of wall plaster to be delivered at New Haven, and which was conditioned upon the delivery of the plaster by the G. Co. as agreed. In fact no contract for the purchase then existed, nor was any made until the following day, at which time it was agreed that the plaintiff should take one thousand tons at $14.60 per ton, freight prepaid, to be delivered at New Haven, with an allowance to the plaintiff of not more than $3 per ton for additional freight charges upon such portions of the plaster as might be shipped by the plaintiff from New Haven to other places. The amount of this allowance being then incapable of definite ascertainment, but being estimated by the parties at $1,500, they proposed to give and take trade acceptances, predated to correspond with the bond, for $13,100 which represented the gross purchase price with the estimated allowance deducted; but the plaintiff's attorney having raised the objection that this amount was not identical with the figure named in the bond, it was arranged that another predated acceptance for $900 be given to the G. Co., which should subsequently be returned to the plaintiff to be applied on the additional freight allowance. The president of the G. Co. then delivered the bond to the plaintiff. Thereafter, the G. Co. failed to carry out the contract, and in the present action by the plaintiff upon the bond, the defendant claimed that it was relieved of liability because the contract, actually entered into by the parties, did not correspond with the terms recited in the bond. *Held:*

1. That the president of the G. Co. was the agent of the defendant to make delivery of the bond.
2. That the defendant could not complain of its own failure to describe the contract more fully in the bond, or to place greater limitations upon the authority of its agent to make delivery.

552 JUNE, 1926. 104 Conn.

New York P. & B. Supplies Co. *v.* Aetna Casualty & Surety Co.

3. That the predating of the contract and the trade acceptances to agree with the date of the bond was fairly within the authority of the agent.

4. That the additional trade acceptance for $900 was not a subterfuge or an attempt to effect a merely colorable compliance with the terms of the bond; that the contract as made came within the purview of the bond and of the authority of the agent to deliver it; and that the defendant was liable for the damages sustained by the plaintiff.

Argued April 15th—decided June 9th, 1926.

ACTION against the surety upon a bond conditioned upon the due performance by the principal of a contract to deliver to the plaintiff a quantity of wall plaster, brought to the Superior Court in New Haven County and tried to the court, *Simpson, J.;* judgment rendered for the plaintiff for $9,409, and appeal by the defendant. *No error.*

*Charles J. Martin* and *Edwin A. Clark,* for the appellant (defendant).

*Philip Pond* and *Daniel D. Morgan,* for the appellee (plaintiff).

MALTBIE, J. The International Gypsum Corporation, Limited, entered into negotiations with the plaintiff in the endeavor to make a sale of wall plaster to it, its proposal being that the plaintiff give to it trade acceptances to cover the price. The plaintiff was unwilling to give such acceptances unless it could itself have security against loss in the transaction. Riddle, the president of the Gypsum Corporation, thereupon, on October 9th, 1923, secured the execution by the defendant bonding company of the bond upon which this suit is based. This bond is dated that day; runs in the sum of $14,000; recites that the obligee "has given" trade acceptances amounting to that sum, "payable one hundred and twenty days from date

hereof," to cover a purchase of one thousand tons of wall plaster, to be delivered at New Haven; and is conditioned that the Gypsum Corporation shall make delivery of the plaster as agreed. No agreement had in fact then been made nor trade acceptances given, but the defendant delivered the bond to Riddle, and the next day he brought it to New Haven, and again took up negotiations with Batter, president of the plaintiff corporation. They finally arrived at an agreement for the purchase of one thousand tons of plaster, at a price, delivered in New Haven, of $14.60 a ton, as evidenced by a memorandum signed by Riddle; the Gypsum Corporation was, however, to allow $3 a ton for the return of bags, freight prepaid and in good condition; and it was further agreed that it would pay additional freight charges from New Haven to other places, not exceeding $3 a ton, the memorandum running as follows: "Inasmuch as the rail rate varies, an adjustment will have to be made on each cargo after final shipments have been made. For our present purposes it is estimated that 75% of the one thousand ton cargo to be shipped at once will be shipped outside of New Haven and that the rail rate will average approximately $2.00 per ton. . . . $14.60 for one thousand tons equals fourteen thousand six hundred dollars, minus the present rail adjustment of fifteen hundred leaves thirteen thousand one hundred dollars."

At Batter's request, he and Riddle then went to the office of the plaintiff's attorney, and the attorney then prepared a letter dated October 9th, 1923, addressed to the plaintiff and signed by Riddle covering the terms of the agreement; stating that the price was to be $14.60 per ton, with delivery at New Haven, and that the Gypsum Corporation would pay any duty on the goods; and continued: "If any of said goods are

sold by you in parts other than the City of New Haven, we will allow you actual additional cost of freight, but not to exceed $3.00 per ton." The attorney questioned the sufficiency of the bond, if the plaintiff proposed to give trade acceptances only for the balance of the purchase price after the deduction of the local freight charges, that is, for $13,100, instead of the $14,000 recited in it as the amount of the acceptances, and it was finally agreed that an additional acceptance for $900 should be drawn, delivered to the Gypsum Corporation, and, as the finding states, "by it subsequently returned to the plaintiff as a part of the allowance for local freight." On the suggestion of the attorney, it was also agreed that another of the trade acceptances should be made out in the amount of $4,400, to cover the estimated charges for freight and duty, and should be discounted at a New Haven bank, the proceeds to be applied by it to pay those charges. Trade acceptances for $900, $4,400, $5,600, and $3,100, were accordingly drawn, all dated the day before to correspond with the date of the bond; they were accepted by the plaintiff, Batter acting for it, and Riddle signed on behalf of the Gypsum Corporation. The bank sent those for $900 and $4,400 to its correspondent in Boston, where a counter signature necessary to bind that corporation was secured; and they were returned to the bank, where they still were when the action was tried. The Gypsum Corporation itself took the other two trade acceptances. Sometime during the transaction, Riddle delivered the bond to the plaintiff, and, the Gypsum Corporation having failed to deliver the plaster as agreed, the present action is brought to enforce it.

The defendant, by placing its bond fully executed in Riddle's hands, made him its agent for the delivery of it to the Gypsum Corporation. *Nash* v. *Fugate,* 65

Va. (24 Gratt.) 202, 209; *Gritman* v. *United States Fidelity & Guaranty Co.,* 41 Wash. 77, 83 Pac. 6; *Baker County* v. *Huntington,* 47 Ore. 328, 83 Pac. 532; *Singer Mfg. Co.* v. *Freerks,* 12 N. D. 595, 98 N. W. 705. The question before us is, did Riddle have sufficient authority to enable him to make an effective delivery of it under the circumstances we have stated? *American Bonding Co.* v. *United States,* 233 Fed. 364, 369.

When the defendant's representative placed the bond, fully executed, in Riddle's hands for use in a transaction thereafter to be consummated, without giving him any special instructions, it certainly authorized him to deliver it to the plaintiff to secure the performance by that corporation of its obligations under any agreement which came within the terms of the instrument, that is, a sale of one thousand tons of merchantable wall plaster, to be delivered at New Haven not later than November 15th, 1923, and, in return, the delivery by the plaintiff of trade acceptances amounting to the sum of $14,000. Had the defendant desired more in the way of conditions as to the use of the bond, it should have made the necessary provisions in it or by the terms of the authority given for its use. *Butler* v. *United States,* 88 U. S. (21 Wall.) 272, 275. Not having done that, it certainly cannot complain so long as the parties did not try to use the bond in a transaction which did not fall within its terms; nor could it fairly demand as a condition of its obligation under it that it be informed of, and give its special consent to, the details of any transaction that did fall within those terms. "If a person deliberately contracts for an uncertain liability he ought not to complain when that uncertainty becomes certain." *United States Fidelity & Guaranty Co.* v. *Pressed Brick Co.,* 191 U. S. 416, 425, 24 Sup. Ct. 142. If the agreement of the parties and the steps taken up

to the delivery of the bond to the plaintiff were fairly within its purview, Riddle was authorized to deliver it, and the plaintiff may enforce it.

The defendant contends that the delivery of the bond to the plaintiff under the circumstances detailed was "in law a fraud upon it, relieving it of liability." By this it cannot mean that there was any actual fraud on the part of either the plaintiff or the Gypsum Corporation, because the finding negatives that. Nor can the defendant claim that the terms of the actual agreement between that corporation and the plaintiff ought to have been fully disclosed to it, for, as we have pointed out, it authorized the delivery of the bond if certain general conditions were met, and, if they were, it was thereafter too late to complain because more information was not given to it. Nor is it of significance that the agreement and trade acceptances were dated back a day to correspond with the date of the bond. The bond recites that the trade acceptances had been given. But it was intended to be used in the execution of an agreement then known to the representatives of the defendant as one to be consummated in the future, and in the absence of any instruction from it, the Gypsum Corporation would have a reasonable time to complete the making of the agreement. The defendant having chosen to recite that the obligee "has given" the trade acceptances, "payable one hundred and twenty days from date," the pre-dating of the trade acceptances and agreement to the date of the bond did not change the legal effect of the transaction, but merely brought the papers into conformity, and was fairly within the authority conferred upon Riddle.

The defendant's real contention must be that Riddle had no right to deliver the bond nor the plaintiff to enforce it, because the giving of the trade acceptance

for $900 was but a subterfuge, its purpose being to create a merely colorable compliance with the recital in the bond that trade acceptances amounting to $14,000 had been given. The defendant proceeds upon the theory that the price of plaster agreed upon between the parties was $13,100, and hence the trade acceptance.given for $900, being in excess of that sum, was without consideration and a mere formality. An examination of the memorandum of sale and the contract shows the fallacy of this position. The price agreed upon was $14.60 a ton, a total of $14,600, subject, however, to deductions amounting to $3 a ton if the bags in which the plaster was shipped were returned, and to a further deduction of freight charges should the plaintiff ship any of the plaster out of New Haven, not exceeding $3 a ton. The $1,500 deducted from the total price to reduce the sum apparently due to $13,100 was a mere estimate of the amount which ultimately might have to be deducted on account of the latter provision. The debt which would actually be owing to the Gypsum Corporation for plaster could not be determined in advance and the sum of $13,100 represents an estimate made for the obvious purpose of fixing the amount of trade acceptances which it was then intended that corporation was to receive for its own use and benefit. A valid agreement might then have been made, leaving the bond out of consideration for the moment, that trade acceptances for the entire difference between that sum and the full purchase price of $14,600 were also to be accepted and deposited with some bank with the understanding that they were to be collected and the proceeds, so far as they represented sums ultimately found to be due the Gypsum Corporation, were to be remitted to it, any balance to be returned to the plaintiff, and that, if no part of the sum represented by them should ultimately be due the

Gypsum Corporation, then the acceptances or their proceeds to be returned to the plaintiff; and if this arrangement could have been made as to the entire difference between the two sums, it could also be made with reference to any portion of it.

The court has found that the trade acceptance for $900 was actually drawn and delivered to the Gypsum Corporation by the plaintiff upon an agreement that it should be "subsequently returned to the plaintiff as a part of the allowance for local freight." The very terms of that agreement imply that the acceptance was a thing of value, for it was to be used to cancel a possible obligation of the Gypsum Corporation to the plaintiff to deduct the amounts incurred for freight charges out of New Haven. Moreover, that agreement must be read in the light of the situation confronting the parties and their subsequent conduct. The provision of the contract for a deduction of freight charges out of New Haven might never come into operation and the sum of $1,500 agreed upon as representing them was a mere estimate as to an amount that might become due on that account. The trade acceptance for $900 was delivered to the bank, by it forwarded to be countersigned, and by it held, with the trade acceptance for $4,400, upon its return. No doubt both parties fully expected that the acceptance for $900 would ultimately be returned to the plaintiff, but it is significant that the bank did not return it to the plaintiff, nor did the plaintiff ask for it, and that it remained with the acceptance of $4,400, which belonged to the Gypsum Corporation, subject to its payment of freight and duty upon the plaster. The Gypsum Corporation had an interest in the acceptance for $900, which was more than colorable; and had none of the plaster been shipped out of New Haven, that corporation would have been entitled to claim it or

its proceeds. While clearly made in order to bring the amount of the trade acceptances up to the sum recited in the bond as the total of those involved in the transaction, it nevertheless was not valueless nor a subterfuge adopted to reach a merely formal compliance with those recitals. The defendant made no stipulations as to the use or disposition that should be made of any of the trade acceptances after they had been delivered, and cannot now be heard to complain of any proper use which the Gypsum Corporation did make of them.

There is no error.

In this opinion the other judges concurred.