[Civil No. 3169. Filed September 17, 1932.]

[14 Pac. (2d) 258.]

CHARLES H. KROEGER and KATIE A. KROEGER, His Wife, Appellants, v. UNION INDEMNITY COMPANY, a Corporation, Appellee.

468

Messrs. Conner & Jones and Mr. Samuel L. Pattee, for Appellants.

Messrs. Mathews & Bilby, Mr. T. K. Shoenhair, and Mr. Manning W. Heard, for Appellee.

LOCKWOOD, J.—Charles H. Kroeger and Katie A. Kroeger, his wife, hereinafter called plaintiffs, brought suit against Union Indemnity Company, hereinafter called defendant, to recover on a bond guaranteeing the performance of a certain building contract. Defendant answered admitting the execu-

tion of the bond, but claimed as its principal defense that it was given to secure the performance of an entirely different and distinct contract from the one which plaintiffs allege to have been breached. The case was tried to a jury, but, at the conclusion of the evidence, the trial court sustained a motion for an instructed verdict in favor of defendant, and an appeal has been taken to this court.

There are a number of assignments of error, but we think the appeal can and should be determined on the question of whether or not the bond secured the performance of the contract alleged by plaintiffs to have been breached, or of some other contract. If the latter be true, the action of the court in instructing a verdict was of course proper. If the former is the correct situation, then the court erred in not submitting the case to the jury.

In order that we may pass on this question, it is necessary that we consider the evidence in the strongest light in favor of the theory of plaintiffs. So taken the facts may be stated as follows: Plaintiffs were the owners of certain real estate situated in Tucson and decided to erect a hotel building thereon. They therefore entered into negotiations with the T. C. Triplett Company, a corporation, hereinafter called the contractor, and finally made a certain written contract with it which was dated and executed on the twenty-first day of April, 1928. This contract, so far as we need consider it for the purposes of this case, contains the following provisions:

"The said hotel building shall be constructed according to plans and specifications which shall be known as Plan No. 1678. It is agreed between the parties hereto that the said hotel building shall not be started before the plans and specifications have been approved by the owner in every detail and identified by the signatures of the parties hereto. When completed and approved, said plans and specifi-

cations shall become and be a part of this agreement as though copied at length herein. Until said plans and specifications are completed, a brief outline of the proposed plans and specifications is hereto attached and made a part hereof.

"The said building is to be completed and ready for occupancy on the 15th day of October, 1928; it being understood, however, that the builder is to be given one hundred and fifty (150) working days after the first mortgage hereinafter mentioned has been placed. . . .

"In consideration of the erection and construction of said building by the builder as herein mentioned, the owner agrees to pay to said builder for the completed building, the sum of One Hundred Forty Three Thousand Six Hundred Seventy-five & no/100 ($143,-650.00) lawful money of the United States of America, in the following manner, to-wit:

"(a) $110,000.00 by the execution of a first mortgage and note by the owner herein, covering the above-described property, running for a period of five years with interest at the rate of 8% per annum, payable semi-annually, which mortgage is to be drawn in such manner that the builder may draw on funds derived therefrom as the construction of said building progresses; provided, however, said mortgage shall not be executed or delivered by the owner until said plans and specifications have been completed and approved by owner and the bond of builder approved as hereinafter mentioned.

"(b) $33,650.00 by the execution of a second mortgage and note by the owner in favor of the builder.

"It is understood and agreed between the parties hereto that the builder will arrange for and pay for the placing of the first mortgage hereinbefore mentioned, and shall pay all interest and other charges incurred in the placing of said mortgage, up to the completion of said building.

"It is agreed by the parties hereto, that the owner will execute and deliver a second mortgage in favor of the builder, in an amount of $33,650.00 at the time of the execution of the first mortgage. . . .

"It is further agreed that in the event of the failure of the builder to secure funds to be secured by the first mortgage hereinabove mentioned within sixty days, this contract shall be null and void and the parties hereto shall not be liable for any damages. . . . "

Thereafter the contractor endeavored to secure the financing of the building, as provided in the contract, and interested the Mortgage Investment Company of El Paso, Texas, hereinafter called the finance company, in the proposition. This company, after investigating it, on May 10th wrote to the contractor as follows:

"With reference to the proposed building loan of $129,400.00, which you desire to sell to us, to be secured by a first mortgage on property in the City of Tucson, more fully described as follows:

"Lots One (1), Four (4), Five (5) and Eight (8) in Block Ninety-three (93) of the city of Tucson, Pima County, Arizona, according to the official survey, field notes and map thereof as made and executed by S. W. Forman and approved and adopted by the mayor and common council of said city (then village) of Tucson on June 26, 1872, a certified copy of which map is of record in the office of the county recorder of Pima County, Arizona, in Book 3 of Maps and Plats at page 70 thereof, on which is to be erected a four-story hotel building, containing lobby, and a certain number of ground floor office rooms, and eighty-four hotel rooms (according to plans and specifications to be submitted to us and approved by us) it being understood that the amount of the first mortgage will be substantially in the sum of $129,400.00, and to be repayable as follows: . . .

"Evidence will have to be furnished us before we put any money into the building that Mr. Kroeger has arranged his financing so that he will be able to pay for his furniture in cash, and that he has an agreement with you to carry a second mortgage on the real estate for him, which we understand will be in the sum of $26,150.00.

"It is understood and agreed that Mr. Roy Place of Tucson, Arizona, will represent us in the capacity of inspector, having access at all times to the job, seeing that the building is erected according to plans and specifications. . . .

"You are to furnish us with a surety bond, in a surety company acceptable to us, and carry compensation and liability insurance, and adequate fire and wind or tornado insurance, as the work progresses, in companies acceptable to us.

"The building is to be completed within a period of six months from this date. . . . "

And such proposition was accepted in writing by the contractor and plaintiff on the 14th of May. On the 24th of May the contractor made an application to the defendant through its general agent for the state of Arizona, Charles E. MacMillin, for the bond sued on in this action. Such application in describing the contract which the bond applied for was to cover provided among other things as follows:

"6. Nature of Contract? (Give locality and description of work) Hotel building, to be located SE corner E. Broadway & Herbert St., Tucson, Arizona (for detail see plans and specifications) . . .

"10. Give name and address of architect or engineer in charge W. B. Winchester, Tucson, Arizona. . . .

"25. With what bank have you arranged a loan for the purpose of handling this contract? Mortgage Investment Co., El Paso.

"26. What is the amount of such loan? $120,-000.00."

On the twenty-fifth day of May the bond sued on was duly executed by MacMillin on behalf of the defendant in Phoenix and by him forwarded to the contractor in Tucson, with whom it remained until it was delivered to the Tucson Realty & Trust Company, the agent for the finance company and plaintiffs, on June 29th.

At the time the application for the bond was made to MacMillin he was thoroughly informed about the situation regarding the financing and had seen both the building contract of April 21st and the letter of May 10th. The finance company was not satisfied with the plans and specifications prepared by Winchester, and finally it was agreed between it, the contractor, and plaintiffs that the building should be constructed according to certain plans prepared by Roy Place, who was to be the supervising architect, differing materially from those described in the contract of April 21st as No. 1678, and prepared by Winchester.

On June 13th the written contract declared on was prepared and executed by the contractor and the plaintiffs. Such contract, however, on its face showed the date of the twenty-first day of April, the same as that of the original contract actually made on such date. It differed in several material particulars from the first contract, the principal differences being shown by a comparison of the following clauses of the contract with those covering similar matters in the original contract:

"The said hotel building shall be constructed according to plans and specifications prepared by Roy Place, local architect, 79 N. Stone Ave., Tucson, Arizona.

"It is agreed between the parties hereto that the said hotel building shall not be started before the said plans and specifications have been approved by the Owner in every detail and identified by the signatures of the parties hereto. When completed and approved, said plans and specifications shall become and be a part of this agreement as though copied at length herein. Until said plans and specifications are completed, a brief outline of the proposed plans and specifications is hereto attached and made a part hereof.

"The said building is to be completed and ready for occupancy on the 15th day of November, 1928; . . .

"In consideration of the erection and construction of said building by the builder as herein mentioned, the owner agrees to pay to said builder for the completed building, the sum of One Hundred Forty Three Thousand Six Hundred Fifty and no-100 Dollars ($143,650.00) lawful money of the United States of America, in the following manner, to-wit:

"(a) $120,000.00 by the execution of a first mortgage and note by the owner herein. . . .

"(b) $26,150.00 by the execution of a second mortgage and note by the owner in favor of the builder, it being understood, however, that the builder is to pay to the owner, the sum of $2,500.00 in cash out of this amount on or before 30 days from the completion of the building. . . .

"It is understood by the parties hereto, that the owner will execute and deliver a second mortgage in favor of the builder, in an amount of $26,150.00 at the time of the execution of the first mortgage. . . .

"The builder agrees to execute and deliver to the owner a good and sufficient bond, subject to the approval of the owner, in the sum of $143,650.00 for the completion and payment of the building under the terms and conditions mentioned herein."

The plans and specifications prepared by Place in accordance with the second contract were approved by the finance company, and, on June 29th, a mortgage to secure the loan to be made by the latter was duly executed and recorded. At the same time the bond was delivered to the Tucson Realty & Investment Company, as aforesaid. The finance company did not consider that this bond protected it as required by the finance contract since it ran to plaintiffs, and required the latter to assign the bond to it. This assignment was duly made and defendant notified thereof, and after some little time it assented thereto. Later on, and before the beginning of this action, the bond was reassigned to plaintiffs.

The contractor failed to pay for the materials furnished and used in the construction of the building, and various liens were filed, including one by the contractor itself. An action was brought to foreclose the liens which resulted in judgments in favor of all the lien claimants, except that of the contractor, which last was adjudged to have no lien. In order to pay off this judgment, plaintiffs were forced to raise a considerable amount in excess of what they had agreed to pay under the terms of the building contract, and to do so had to borrow the money at a considerable discount. After the payment of judgment, plaintiffs brought this suit, setting up as damages the amounts paid to the lien claimants over and above the amount set forth in the building contract, various items of expense which they were compelled to incur to complete the building, the discount which they had been compelled to stand in order to raise the funds to pay off the lien claimants, and the expense to which they had been subjected by way of attorney's fees in fighting the unfounded lien claim of the contractor.

The first and vital question presented by this statement of facts is whether or not the bond executed by MacMillin on the 24th of May as aforesaid, and by him sent to the contractor on May 25th, and by it delivered to Tucson Realty & Trust Company on June 29th, as a matter of law secured the contract of April 21st or that of June 13th. The bond, so far as we need consider it in determining the question, reads as follows:

"Know all men by these presents, that we, T. C. Triplett Building Company, a corporation (hereinafter called the principal), and Union Indemnity Company, a Louisiana corporation with offices at 100 Maiden Lane, in the City of New York (hereinafter called the Surety) are held and firmly bound unto C. H. Kroeger and Katie A. Kroeger (hereinafter

called the Obligee), in the full and just sum of One
Hundred Forty-Three Thousand Six Hundred Fifty
and 00/100 Dollars, lawful money of the United
States. . . .

"Whereas, said Principal entered into a certain
written contract with the Obligee dated April 21st,
1928, for the construction of one certain hotel build-
ing located in the City of Tucson on the following
described property:

"Lots One (1), Four (4), Five (5), and Eight (8)
in Block Ninety-Three (93) of the City of Tucson,
Pima County, Arizona, according to the official map
and plat of record in the office of the County Recorder
of said Pima County, Arizona, in Book 3 of Maps and
Plats, at page 70 thereof.

"Now, therefore, the condition of the foregoing
obligation is such that, if the said Principal shall
well and truly indemnify and save harmless the
said Obligee from any pecuniary loss resulting from
the breach of any of the terms, covenants and con-
ditions of the said contract on the part of the said
Principal to be performed, then this obligation shall
be void; otherwise to remain in full force and effect
in law."

It is the contention of defendant, with which the
court concurred, that this bond shows on its face and
by all the surrounding circumstances that it was
given to secure a contract "dated April 21st, 1928,"
and that such contract was necessarily the one which
was actually executed on that date and which it is
admitted was never carried out. It is the position
of plaintiffs that, under the facts as shown by the
evidence presented by them, the defendant was well
aware that the contractor and plaintiff had agreed
on May 14th that the contract of April 21st was
subject to such changes and modifications as might be
made on the request of the finance company in accord-
ance with its letter of May 10th aforesaid, and that,
when it executed and delivered the bond, it did so
with the implied understanding and agreement that it

should secure a future contract to be made in accordance with the terms of the contract of April 21st as modified in accordance with the letter of May 10th. The bond on its face guarantees a contract identified as "dated April 21st, 1928." There are in evidence two written contracts bearing that date, either one of which on its face would satisfy the description in the bond. It was therefore necessary and proper to resort to extrinsic evidence to show which of the two contracts the bond really secured. *Bergin* v. *Williams,* 138 Mass. 544; *Pulaski Hall Assn.* v. *McLeod et al.,* 123 Minn. 222, 143 N. W. 715; 22 C. J. 181.

It is undisputed that the only written contract satisfying the description of the bond which was in existence at the time the latter was executed and delivered was the one which was never carried out, while the other one was not executed until some two weeks after the delivery of the bond by MacMillin. If the position of plaintiffs can be sustained, it must be on the theory that defendant executed a bond to secure the performance of a contract, the details of which had not yet been definitely settled, but were to be fixed in the future along the lines of the letter of May 10th. This procedure, of course, is unusual, but it is by no means unheard of, and, if the parties to a bond actually so agree, there is no reason why it may not be followed. *New York Plumbing & Building Supplies Co.* v. *Aetna C. & S. Co.,* 104 Conn. 551, 133 Atl. 588. As was said in *United States Fidelity & G. Co.* v. *United States,* 191 U. S. 416, 48 L. Ed. 242, 24 Sup. Ct. Rep. 142: "If a party deliberately contracts for an uncertain liability, he ought not to complain when that uncertainty becomes certain."

And we have repudiated the rule of *strictissimi juris* in cases of this kind. *Massachusetts Bonding & Ins. Co.* v. *Lentz, ante,* p. 46, 9 Pac. (2d) 408.

The person who actually executed the bond on behalf of defendant was admittedly its general agent for Arizona. In the absence of some showing to the contrary, a general agent for a bonding company has all the powers that the corporation itself has in regard to the execution and delivery of bonds, and notice to him is notice to the corporation. 2 C. J. 581, 859.

There is testimony in the record from which the jury could well have believed that, at the time he executed the bond, he knew that the original contract of April 21st was by the agreement of the parties, subject to any modification fairly to be implied from the letter of May 10th, and that the bond which he was asked to execute was to secure the contract which the evidence shows was finally agreed upon by the contractor and the plaintiff and approved by the finance corporation on June 13th. If he executed and delivered the bond with this knowledge and agreement on his part, express or implied, and the contract of June 13th, antedated to April 21st, was in substantial accord with the original contract of April 21st, and such modifications as might properly be made thereto under the terms of the letter of May 10th, then the bond secured such contract of June 13th and the defendant was liable for a breach thereof. There was substantial evidence to this effect, and there was also evidence from which the jury could have found the contract was breached to the damage of plaintiffs. For the foregoing reasons the court erred in taking the case from its consideration and instructing a verdict, and the case must be reversed and remanded for a new trial. Although we have considered them, it is not necessary that we determine all the other issues raised on the appeal, but since some of the same questions might arise on a second trial, we think it best to refer to two of them briefly in this opinion. So far as the element of attorneys' fees is concerned

it is a proper item of damages to be considered. *Massachusetts Bonding & Ins. Co.* v. *Lentz, supra.* We think, however, that the brokerage fee paid by plaintiffs in order to secure the money with which they paid off the lien is not. For the foregoing reasons the judgment of the superior court of Pima county is reversed, and the case remanded with instructions to grant a new trial in accordance with the principles laid down in this opinion.

McALISTER, C. J., and ROSS, J., concur.